1   Daniel Cooper (SBN 153576)
2   daniel@sycamore.law
    Jesse C. Swanhuyser (SBN 282186)
3   jesse@sycamore.law
4   SYCAMORE LAW, INC.
    1004 O'Reilly Avenue, Ste. 100
5   San Francisco, CA 94129
6   Tel: (415) 360-2962

7   Attorneys for Plaintiff
8   ECOLOGICAL RIGHTS FOUNDATION

9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a public benefit non-profit corporation, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |
| vs. | |
| DIVERSIFIED PANELS SYSTEMS, INC., a California corporation, | **Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387** |
| Defendant. | |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  JURISDICTION AND VENUE

1. This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act (the "Clean Water Act" or "Act"), 33 U.S.C. § 1251, *et seq.*

2. This Court has subject matter jurisdiction over Ecological Rights Foundation ("EcoRights" or "Plaintiff") and Diversified Panel Systems, Inc. ("Diversified" or "Defendant") (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3. This complaint seeks relief for ongoing violations by Diversified of the Clean Water Act and California's General Industrial Storm Water Permit[1] ("General Permit") related to unpermitted polluted storm water and non-storm water discharges from the industrial facility owned and operated by Diversified at 2345 Statham Boulevard in Oxnard, California (93033) ("Facility").

4. The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties); 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

5. Prospective citizen plaintiffs must, as a jurisdictional pre-requisite to enforcing the Clean Water Act in Federal District Court, prepare a Notice of Violation and Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient

---

[1] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ; as amended on November 6, 2018.

COMPLAINT                                        2

information to allow the recipient to identify the standard, limitation or order alleged to be violated, and the activity alleged to constitute a violation. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

6.     The Notice Letter must be sent via certified mail at least sixty days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act, and where the alleged violator is a corporation, to the corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

7.     A copy of the Notice Letter must be mailed to the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and the chief administrative officer for the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(b)(1)(A).

8.     On February 18, 2021, Plaintiff sent a Notice Letter via certified mail to Diversified and its registered agent for service of process. The Notice Letter described ongoing violations of the Act and General Permit at the Facility, and provided notice of Plaintiff's intention to file suit against Defendant at the expiration of the 60-day Notice Period.

9.     The Notice Letter was received by: (a) Richard Bell, CEO and Agent for Service of Process, at the Facility on Diversified on February 19, 2021; (b) U.S. EPA on February 25, 2021; (c) U.S. Department of Justice on February 26, 2021; (d) State Water Resources Control Board on February 24, 2021.

10.     More than sixty days have passed since the Notice Letter was served on Diversified, and the State and Federal agencies.

11.     Plaintiff is informed and believes, and thereon alleges, that neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in the Notice Letter and complaint.

12.     This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

13.     Venue is proper in the Central District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

EcoRights, a California public benefit non-profit corporation, by and through its counsel, hereby alleges:

## II.   **INTRODUCTION**

14.     This complaint seeks relief for unpermitted and unlawful discharges of polluted storm water and non-storm water from the Facility in violation of the Act and General Permit, including, but not limited to, ongoing, unpermitted discharges of polluted storm water to the Oxnard Drain, Ormond Beach Wetlands, Ormond Beach and the Pacific Ocean.

15.     The Clean Water Act is a strict liability statute and failure to enroll in the General Permit, as well as each violation of any term or condition in the General Permit, is an independent violation of the Act. 33 U.S.C. §§ 1342, 1365.

16.     Diversified is liable for ongoing and continuous violations of the Act and General Permit at the Facility since February 18, 2016. 33 U.S.C. §§ 1311(a),

1319(d); 40 C.F.R. § 19.4.

17.     The world faces a crisis in the production, use, and disposal of plastics materials.

18.     There is a staggering 150 million metric tons of plastic in the marine environment polluting every single part of the ocean—from the surface of the Pacific to the depths of the Mariana Trench; and from pole to pole.

19.     Scientists estimate that up to 20 million tons of plastic end up in the ocean annually.

20.     Unless humanity fundamentally changes its use, plastic is set to outweigh fish in the ocean by 2050.

21.     Plastics are also abundant in human water supplies. The average person ingests up to 5 grams of plastic each week—roughly the equivalent of a credit card.

22.     Currently, the annual weight of plastic production globally is roughly the same as the entire weight of humanity.

23.     And because plastic is not biodegradable, it never goes away. Instead, plastics in the environment break down into smaller and smaller microplastics, which because of their miniscule nature, are now found in every nook and cranny of Earth's ecosystems.

24.     With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, flow into Oxnard's storm drains, local waterways, and the Pacific Ocean.

25.     The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks

and rivers each year. *See e.g.* Bay, S., *Study of the Impact of Stormwater Discharge on Santa Monica Bay*, (Nov. 1999).

26.    These discharges of pollutants from industrial facilities contribute to the impairment of surface waters and aquatic dependent wildlife.

27.    Numerous scientific studies in recent decades have documented serious health risks to recreational users of southern California's waters from pollutant-loaded storm water and non-storm water discharges. *See, e.g.,* Stenstrom, M. K., *Southern California Environmental Report Card: Stormwater Impact* at 15; Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* (1999–2000) at 205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* (Santa Monica Bay Restoration Project, 1996) at 5.

28.    Oxnard's waterways are ecologically sensitive areas, and are essential habitat for numerous cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

29.    Oxnard's waterways provide numerous recreational activities, including swimming, fishing, surfing, SCUBA diving, and kayaking.

30.    Oxnard's waterways also provide non-contact recreation and aesthetic opportunities, such as biking and wildlife observation, as well as opportunities for education and research.

31.    Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, plastics, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife,

1  expose people to toxins, and harm the special social and economic benefits Oxnard's

2  waterways have for locals and visitors alike.

3     32.    Controlling polluted storm water and non-storm water discharges is

4  essential to protecting southern California's surface and coastal waters.

5     33.    As the Act requires, these contaminated discharges can and must be

6  controlled for ecosystems to regain their health and to protect public health.

7  **III.    THE PARTIES**

8     34.    EcoRights is a non-profit public benefit corporation organized under the

9  laws of California. The EcoRights office is located at 867 B Redwood Drive,

10 Garberville, California (95542).

11    35.    Founded in 1994, EcoRights is dedicated to promoting rights to a clean,

12 healthy, and diverse environment.

13    36.    Through research, education, and environmental law enforcement,

14 EcoRights protects human and wildlife communities.

15    37.    Where necessary to achieve its objectives, EcoRights initiates citizen

16 enforcement actions under the Act on behalf of itself and its members, including those

17 who live in and around the Oxnard area, and who use and enjoy the Oxnard Drain,

18 Ormond Beach Wetlands, Ormond Beach and the Pacific Ocean (collectively the

19 "Receiving Waters").

20    38.    EcoRights members use and enjoy the Receiving Waters to research,

21 educate, fish, surf, swim, sail, SCUBA dive and kayak.

22    39.    EcoRights members also use the Receiving Waters to engage in scientific

23 study through pollution and habitat monitoring, as well as restoration activities.

40.     The Facility's unlawful discharge of pollutants into the Receiving Waters impairs the ability of EcoRights' members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters, and by posing risks to human health and aquatic life.

41.     The interests of EcoRights and its members, therefore, have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

42.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

43.     The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

44.     Diversified Panels Systems, Inc. filed articles of incorporation with California's Secretary of State on October 19, 1994, listing the company's incorporator, initial director, and agent for service of process as Richard Charles Bell of 1349 Sterling Drive, Thousand Oaks, California (91360).

45.     On its Statement of Information dated June 6, 2014 ("2014 Statement of Information"), Diversified listed its business address as 2345 Statham Boulevard in Oxnard, California (93033).

46.     Diversified's 2014 Statement of Information lists Richard Charles Bell as the company's chief executive officer, secretary, chief financial officer, and agent for service of process at 545 Rimrock Road in Thousand Oaks, California (91361).

47.     The Facility is owned and operated by Diversified and located at 2345

1    Statham Boulevard in Oxnard, California (93033).

2        48.    According to the company website, Diversified "is the industry leader with

3    over 100 years of combined experience in custom design, engineering, [sic]

4    manufacturing custom cold storage buildings and refrigeration systems."

5        49.    Multiple online business databases identify Diversified as engaged in the

6    manufacture of refrigeration equipment under Standard Industrial Classification

7    ("SIC") code 3585 at the Facility.

8        50.    The City of Oxnard identifies the Facility as a SIC code 3585

9    manufacturing facility.

10       51.    The company's web site advertises that "[a]ll Diversified[] panels are

11   made from closed cell…expanded polystyrene (EPS) cores" (hereinafter "EPS").

12   **IV.    LEGAL BACKGROUND**

13       **A.    The Clean Water Act.**

14       52.    The Act is the primary Federal statute regulating the protection of this

15   nation's water.

16       53.    The CWA aims to prevent, reduce, and eliminate pollution in order to

17   "restore and maintain the chemical, physical, and biological integrity of the Nation's

18   waters." 33 U.S.C. § 1251(a).

19       54.    In order to accomplish that goal, Section 301(a), 33 U.S.C. § 1311,

20   prohibits the discharge of any pollutant into waters of the United States unless the

21   discharge complies with other enumerated sections of the Act, including the

22   prohibition on discharges not authorized by, or in violation of, the terms of a National

23   Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section

1   402, 33 U.S.C. § 1342(b). *See also* 40 C.F.R. § 122.26(c)(1) and General Permit, §

2   I.A.12.

3       55.    The Act defines "pollutant" to include "dredged spoil, solid waste,

4   incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes,

5   biological materials, radioactive materials, heat, wrecked or discarded equipment,

6   rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into

7   water." *See* 33 U.S.C. § 1362(6); see also 40 C.F.R. 122.2.

8       56.    The Act requires all point source discharges of pollutants to waters of the

9   United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. §

10  122.26(c)(1).

11      57.    Unpermitted discharges of storm water associated with industrial

12  activities are per se violations of the Act. 33 U.S.C. § 1311(a); <u>*Comm. to Save*</u>

13  <u>*Mokelumne River v. E. Bay Mun. Util. Dist.*</u>, 13 F.3d 305, 309 (9th Cir. 1993) ("the

14  Act categorically prohibits any discharge of a pollutant from a point source without a

15  permit.").

16      58.    Section 402(p) of the Act establishes the framework regulating industrial

17  storm water discharges under federal and authorized state NPDES permit programs.

18  33 U.S.C. § 1342(p).

19      59.    Section 402(b) of the Act allows each state to administer an NPDES

20  permit program for regulating the discharge of pollutants, including discharges of

21  polluted storm water approved by the U.S. EPA. 33 U.S.C. § 1342(b).

22      60.    States with approved NPDES permit programs are authorized by section

23  402(b) to regulate industrial storm water discharges through the issuance of a

1  statewide general NPDES permit applicable to all industrial dischargers and/or

2  through individual NPDES permits issued to dischargers. *See Id.*

3     61.    Section 505(a)(1) of the Act provides for citizen enforcement against any

4  "person" who is alleged to be in violation of an "effluent standard or limitation . . . or

5  an order issued by the Administrator or a State with respect to such a standard or

6  limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

7     62.    A "person" under the Act includes individuals, corporations,

8  partnerships, associations, States, municipalities, commissions, and political

9  subdivisions of a State, or any interstate body. 33 U.S.C. 1362(5).

10    63.    "Effluent standard or limitation" is defined to include: (a) the prohibition

11 in section 301(a) against unpermitted discharges; or (b) a condition of an NPDES

12 permit such as the General Permit. 33 U.S.C. § 1365(f); *Citizens for a Better Env't v.*

13 *Union Oil Co.*, 83 F.3d 1111, 1114 (9th Cir. 1996) ("Private citizens may bring suit

14 pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are

15 defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).").

16    64.    Each separate violation of the Act subjects the violator to a penalty of up

17 to $52,414 per day per violation for violations occurring after November 2, 2015. 33.

18 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary

19 Penalties for Inflation).

20    65.    Section 505(d) of the Act allows a prevailing or substantially prevailing

21 party to recover litigation costs, including fees for attorneys, experts, and consultants

22 where it finds that such an award is appropriate. 33 U.S.C. § 1365(d).

23

1       **B.**     **California's Storm Water Permit.**

2       66.     The State Board Water Resources Control Board ("State Board") is

3 charged with regulating pollutants to protect California's water resources. *See* Cal.

4 Water Code § 13001.

5       67.     California is authorized by U.S. EPA to issue NPDES permits for storm

6 water discharges associated with industrial activities.

7       68.     The relevant NPDES permit in this action is the General Permit, which is

8 issued by the State Board, and is implemented and enforced by Regional Boards,

9 including the Los Angeles Regional Water Quality Control Board ("LA Regional

10 Board"). *See* 33 U.S.C. §§ 1311(a), 1342, 1362(6), 1362(7), 1362(12).

11       69.     In order to lawfully discharge pollutants to waters of the United States in

12 California, all persons who discharge storm water associated with industrial activity

13 must enroll in, and comply with all terms and conditions of, the General Permit. *See*

14 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1).

15       70.     The General Permit requires that a discharger file an NOI with the State

16 Board prior to discharge. The NOI serves as certification to the State of California that

17 the industrial facility owner(s) and agent(s) have read the General Permit and will

18 comply with all of its terms and conditions. *See* 40 C.F.R. § 122.26(A)(1)(ii); General

19 Permit, Finding #12.

20       71.     As described above, the Facility is a manufacturing facility classified

21 under SIC code 3585. SIC Code 3585 facilities must enroll in and obtain coverage

22 under the General Permit in order to lawfully discharge storm water to waters of the

23 United States. *See* General Permit, Attachment A, ¶ 2.

72.     Once enrolled, the General Permit requires permittees to consistently engage in four independent, but mutual-reinforcing actions: 1) executive planning and facility-specific pollution control design; 2) on-the-ground implementation of pollution control technologies; 3) monitoring storm water discharges for evidence of pollution; and 4) annual evaluation of the effectiveness of pollution control strategies, including corrective action where necessary.

73.     Compliance with the General Permit constitutes compliance with the Clean Water Act for purposes of storm water discharges. 33 U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." General Permit, § XXI.A.

74.     Discharges of storm water containing pollutants to waters of the United States, therefore, are violations of the Act where they are: (a) unpermitted; or (b) completed without complying with all terms and conditions of a valid NPDES permit. *See* 2015 Permit, Finding No. 8 ("This General Permit authorizes discharges of industrial storm water to waters of the United States, so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit.")

**C.      The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

75.     The General Permit contains three sections restricting contaminated discharges from the Facility referred to as: (A) "Discharge Prohibitions;" (B) "Effluent Limitations" (a.k.a. technology-based standards); and (C) "Receiving Water Limitations" (a.k.a. water quality-based standards).

a)    Discharge Prohibitions.

76.     The General Permit contains the following three Discharge Prohibitions.

77.     The General Permit proscribes all discharges of storm water to waters of the United States expect as specifically authorized by the General Permit or another NPDES permit. General Permit, § III.A

78.     The General Permit proscribes storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code. General Permit, § III.C.

79.     The General Permit proscribes discharges that violate discharge prohibitions contained in applicable Basin Plans, or statewide water quality control plans and policies. General Permit, § III.D.

80.     The Water Quality Control Plan for Inland Surface Waters, Enclosed Bays, and Estuaries ("ISW Plan") is a statewide water quality control plan. The ISW Plan was amended on April 7, 2015. U.S. EPA approved the amendment on January 12, 2016.

81.     The Media Release announcing the amendment notes that "[t]rash in our lakes, streams, and the ocean pose a serious threat to fish and wildlife as well as harming the public's ability to enjoy our precious beaches and waterways."

82.     The ISW Plan defines trash to include "[a]ll improperly discarded solid material from any production, manufacturing, or processing operation including, but not limited to, products, product packaging, or containers constructed of plastic, steel, aluminum, glass, paper, or other synthetic or natural materials."

83.     The ISW Plan contains the following Prohibition on Discharge: "The

discharge of trash to surface waters of the State or the deposition of trash where it may be discharged into surface waters of the State is prohibited." [2]

b) Effluent Limitations.

84.    The General Permit contains technology-based pollution reduction standards titled Effluent Limitations.

85.    The Act and General Permit requires dischargers to comply with statutorily established technology-based standards. 33 U.S.C. § 1311(b); General Permit, § V.

86.    The General Permit's Technology Based Effluent Limitations set the floor for pollution reduction, i.e. the minimum level of pollution reductions that must be achieved by all permittees regardless of the quality of water receiving storm water discharges.

87.    The General Permit's technology-based Effluent Limitations require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 40 C.F.R. §§ 401.15-401.16; General Permit, § V.A.

88.    Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, TSS, oil and grease, pH, and fecal coliform.

89.    Toxic pollutants are listed at 40 C.F.R. § 401.15 and include zinc, among others.

---

[2] See https://www.waterboards.ca.gov/water_issues/programs/trash_control/.

1    90.    Compliance with the General Permit's technology-based standard

2   requires permittee facilities design and implement effective, site-specific pollution

3   control strategies called Best Management Practices ("BMPs") that prevent or reduce

4   storm water discharges in a manner that reflects best industry practice. General

5   Permit, § V.A.

6    91.    BMPs are schedules of activities, prohibitions of practices, maintenance

7   procedures, and other management practices to prevent or reduce the pollution of

8   waters of the United States. BMPs include treatment systems, operation procedures,

9   and practices to control and abate the discharge of pollutants from the Facility. *See id*.

10    92.    Permittees must design BMPs that meet the BAT standard for all sources

11   of toxic pollutants; and thereafter implement and maintain, as well as evaluate and

12   improve, such BMPs so as to ensure pollutant concentrations in any storm water

13   discharge are controlled consistent with the BAT standard. *See id*.

14    93.    The 2008 and 2015 versions of U.S. EPA's NPDES Storm Water Multi-

15   Sector General Permit for Industrial Activities include numeric benchmark standards

16   for pollutant concentrations in storm water discharges ("EPA Benchmarks"). *See*

17   United States Environmental Protection Agency NPDES Multi-Sector General Permit

18   for Storm Water Discharges Associated with Industrial Activity, effective September

19   29, 2008 (as modified effective May 27, 2009) and effective June 4, 2015[3]; *see* 80 FR

20   34403, 34405 (June 16, 2015)

21    94.    EPA Benchmarks serve as objective measures for evaluating whether the

22   BMPs designed and implemented at a facility achieve the statutory BAT/BCT

23

[3] https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_finalpermit.pdf.

standards. *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP)*, as modified effective June 4, 2015 ("Multi-Sector Permit"), p. 41; *see also* 80 Federal Register 34403 (June 16, 2015); 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

95.    The discharge of storm water containing pollutant concentrations exceeding EPA Benchmark targets evidence a failure to develop and implement pollution control strategies that achieve pollutant reductions consistent with BAT/BCT standards. *See Santa Monica Baykeeper v. Kramer Metals, Inc.* ("*Kramer*"), 619 F. Supp. 2nd 914, 921-25 (C.D. Cal. 2009); *see also See* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

96.    Table 1 contains EPA Benchmark standards relevant to the assessing the Facility's compliance with the BAT/BCT standards.

TABLE 1: U.S. EPA BENCHMARKS APPLICABLE TO THE FACILITY'S DISCHARGES

| PARAMETER | U.S. EPA BENCHMARK |
|---|---|
| Aluminum (Al) | 0.75 milligrams per liter ("mg/L") |
| Iron (Fe) | 1.0 mg/L |
| Zinc (Zn) | 0.117 mg/L |

97.    Visual observations (and records) required to be conducted pursuant to the General Permit are relevant to assessing a permittee's compliance with the BAT/BCT standards.

98.    Objective assessments of whether BMPs described in a SWPPP are

consistent with industry best practices are relevant to assessing a permittee's compliance with the BAT/BCT standards.

99.   Facilities covered under the General Permit that handle plastics materials are required to implement BMPs to eliminate discharges of plastic in storm water. General Permit, § XVIII.

100.   Plastics materials under the General Permit includes virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, as well as other similar types of preproduction plastics with the potential to discharge or migrate off-site.

101.   Any discharger that manufactures, transports, stores, or consumes plastic materials shall submit information to the State Board together with its NOI, including the type and form of plastics, and which BMPs are implemented at the facility to prevent illicit discharges. *Id*.

102.   Such BMPs must include, at a minimum, containment systems at each on-site storm drain discharge location down gradient of areas containing plastic materials. General Permit, § XVIII.A.1.a.

103.   A containment system shall be designed to prevent the discharge of particles by a 1-millimeter mech screen, with a treatment capacity of no less than the peak flow rate from a one-year, one-hour storm event. *Id*.

104.   Facilities that handle plastic materials smaller than 1-millimeter must develop a containment system designed to trap the smallest plastic material handled at the facility with a treatment capacity of at least the peak flow rate from a one-year, one-hour storm; or develop a feasible alternative BMP or suite of BMPs that are

1   designed to achieve a similar or better performance standard. General Permit, §

2   XVIII.A.1.d.

3       105.   Additionally, plastics facilities shall use durable sealed containers as a

4   form of secondary containment during all transfers, loading, or unloading of plastics

5   materials. General Permit, § XVIII.A.1.c.

6       106.   Finally, facilities that use plastics materials must have a vacuum or

7   vacuum-type system for quick cleanup of fugitive plastic material available for

8   deployment by all employees. General Permit, § XVIII.A.1.e.

9                    c)  <u>Receiving Water Limitations</u>

10      107.   The General Permit contains water quality-based standards titled

11  Receiving Water Limitations.

12      108.   The General Permit Receiving Water Limitations are intended to protect

13  the beneficial uses of surface waters to which a facility's storm water is discharged.

14  General Permit, § VI.A.

15      109.   The General Permit requires permittees to meet "any more stringent

16  [water quality-based limitations] necessary for receiving waters to meet applicable

17  water quality standards." General Permit, §I.D.31.

18      110.   Receiving Water Limitations are generally more stringent than the

19  technology-based standards where a facility's receiving waters are impaired by one or

20  more pollutant. 33 U.S.C. § 1311(b)(1)(C).

21      111.   The General Permit's Receiving Water Limitations prohibit discharges of

22  storm water associated with industrial activity that: (a) cause or contribute to an

23  exceedance of any applicable water quality standards ("WQSs"); (b) adversely affect

human health or the environment; and/or (c) contain pollutants in quantities that threaten to cause pollution or a public nuisance. General Permit, § VI.A-C.

112.   Industrial storm water discharges must strictly comply with WQS. *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).

113.   Storm water discharges with pollutant concentrations that exceed levels contained in applicable water quality standards are violations of the General Permit and the Act. *Kramer* 619 F. Supp. 2nd at 926–27.

114.   WQSs applicable to the Facility are established in, *inter alia*, the Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties ("Basin Plan"), the ISW Plan (see discussion above), and the California Toxics Rule ("CTR"), 40 CFR 131.38.

115.   The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. *See* Basin Plan, California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended).[4]

116.   The Receiving Waters are an important community resource. Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters serve essential social, environmental, and economic functions.

117.   The Ormond Beach Wetlands' designated beneficial uses include Water Contact Recreation, Non-contact Water Recreation, Estuarine Habitat, Wildlife Habitat, Wetland Habitat, and Rare, Threatened, or Endangered Species. Basin Plan,

[4] http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.

1    Table 2-1.

2        118.   The Ormond Beach's designated beneficial uses include Contact

3    Recreation, Non-contact Water Recreation, Industrial Service Supply, Navigation,

4    Hydropower Generation, Commercial and Sport Fishing, Marine Habitat, Wildlife

5    Habitat, Shellfish Harvesting, Rare, Threatened, or Endangered Species, and

6    Spawning, Reproduction, and/or Early Development. Basin Plan, Table 2-1.

7        119.   The General Permit's first Receiving Water Limitation prohibits

8    discharges that cause or contribute to an exceedance of any applicable water quality

9    standard. General Permit, § VI.A.

10       120.   The Basin Plan and ISW Plan includes narrative and numeric water

11   quality standards for inland surface waters and enclosed bays and estuaries for:

12   chemical constituents, toxic substances, pH, oil & grease, suspended or settleable

13   matter, and floating materials.

14       121.   The Basin Plan contains the following Water Quality Objective: "Waters

15   shall not contain floating material, including solids, liquids, foams, and scum, in

16   concentrations that cause nuisance or adversely affect beneficial uses." According to

17   the Basin Plan, "[f]loating materials can be an aesthetic nuisance as well as provide

18   substrate for undesirable bacterial and algal growth and insect vectors." Basin Plan, 3-

19   9.

20       122.   The Basin Plan contains the following Water Quality Objective: "Waters

21   shall not contain suspended or settleable materials in concentrations that cause

22   nuisance or adversely affect beneficial uses." Basin Plan, 3-16.

23       123.   The ISW Plan contains the following narrative Water Quality Objective:

1   "Trash shall not be present in inland surface waters, enclosed bays, estuaries, and

2   along shorelines or adjacent areas in amounts that adversely affect beneficial uses or

3   cause nuisance."[5]

4       124.   Discharges above water quality standards contribute to impairment of

5   Receiving Waters' Beneficial Uses. *See id.*

6       125.   Surface waters that cannot support designated beneficial uses (as listed in

7   the Basin Plan) due to the occurrence of high levels of one or more pollutants are

8   designated as impaired water bodies pursuant to section 303(d) of the Clean Water

9   Act. 33 U.S.C. § 1313(d).

10       126.   According to the State Board's Final 2014/2016 California Integrated

11   Report (also known as "303(d) List"), both Oxnard Drain and Ormond Beach

12   Wetlands are impaired for pH and trash.

13       127.   The General Permit's second Receiving Water Limitation is that

14   pollutant concentrations in storm water discharges shall not adversely impact human

15   health or the environment. General Permit, § VI.B.

16       128.   Storm water discharges with pollutant concentrations that adversely

17   impact human health or the environment are violations of the General Permit and the

18   Act.

19       129.   Use of the Receiving Waters by EcoRights members and the public for

20   water contact recreation and fishing exposes people to toxic metals, pathogens,

21   bacteria, and other contaminants in storm water and non-storm water discharges.

22       130.   Non-contact recreational and aesthetic opportunities, such as wildlife

23

[5] See https://www.waterboards.ca.gov/water_issues/programs/trash_control/.

COMPLAINT                                          22

observation, are also harmed by discharges to the Receiving Waters polluted with metals and plastics/trash.

131.   The General Permit's third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. General Permit, § VI.C.

**D.     The General Permit's Pollution Prevention Plan Requirements.**

132.   The General Permit requires the preparation and implementation of a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ I.I.54, X.B.

133.   To comply with the General Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015 or upon commencement of industrial activity, including the description of BMPs that comply with the BAT/BCT standard. *See* General Permit, § X.B.

134.   The objectives of the SWPPP are to: i) identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges; and ii) describe and detail site-specific BMPs to reduce or prevent pollutant concentrations in discharges to levels that comply with the General Permit's technology-based Effluent Limitations and Receiving Water Limitations. General Permit, § X.C.

135.   The SWPPP must include, *inter alia*: i) a narrative description and summary of all industrial activities, potential sources of pollution, and pollutants associated with each potential source; ii) the identification and location where materials are being shipped, received, stored, and handled, as well as the typical

quantities of such materials and the frequency with which they are handled; iii) a description of dust and particulate generating activities; iv) a site map including all areas of industrial activity subject to the General Permit that depicts the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; v) a description of storm water management practices; vi) a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; vii) the identification of unauthorized non-stormwater discharges and a description of how all such discharges have been eliminated; and viii) a description of persons and their current responsibility for developing and implementing the SWPPP. General Permit, § X.A–I.

136.   The most important elements of any SWPPP are the description of each industrial process occurring at the facility, and the assessment of potential pollutant sources ("Source Evaluation and Pollutant Assessment"). *See* General Permit, §§ X.C, X.F, X.G.

137.   Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed in each SWPPP for their potential contribution of pollutants in storm water discharges.

138.   The SWPPP must be evaluated and revised as necessary, and on at least an annual basis, to ensure ongoing compliance. General Permit, § X.B.

139.   Any failure to develop, implement, or revise a comprehensive SWPPP that contains all required elements is a violation of the General Permit, and creates

1  liability under the Act. General Permit, § X.B; *see also* General Permit, Factsheet §

2  II.I.1.

3      140.   The General Permit requires permittees to complete an Annual

4  Comprehensive Site Compliance Evaluation ("Compliance Evaluation"). General

5  Permit, § XV.

6      141.   The goal of the Compliance Evaluation is to ensure and certify

7  compliance with all other substantive and procedural mandates contained in the

8  General Permit.

9      142.   The Compliance Evaluation must include: a review of all sampling,

10  visual observation, and inspection records conducted during the previous year; a

11  visual inspection of all potential pollutant sources for evidence of, or the potential for,

12  pollutants entering the drainage system; an inspection of all drainage areas previously

13  identified as having no exposure to industrial activities; an inspection of equipment

14  needed to implement BMPs; an evaluation of each BMP to determine whether it is

15  objectively adequate in light of monitoring and reporting plan data; an assessment of

16  BMP design and implementation effectiveness; a determination of whether additional

17  BMPs are needed to comply with the General Permit; and an assessment of any other

18  factors needed to comply with the requirements of Section XVI.B (i.e. Annual Report

19  mandates). General Permit, § XV.

20      **E.    The General Permit's Monitoring and Reporting Requirements.**

21      143.   The General Permit requires that permittees also develop a written plan

22  containing the permittee facility's implementation, monitoring and reporting program

23  ("Monitoring Implementation Plan" or "MIP") prior to conducting, and in order to

lawfully continue, industrial activities. General Permit, §§ X.I.1-5, XI.

144.   The objective of the MIP is to detect and measure concentrations of pollutants in a facility's storm water discharges, and to ensure compliance with the General Permit's substantive mandates, including the technology-based BAT/BCT standards and any more stringent Receiving Water Limitations. *See* General Permit, Factsheet § II.J.1.

145.   A lawful MIP ensures that BMPs are effectively reducing and/or eliminating pollutants in the facility's storm water discharges, and is evaluated and revised whenever appropriate to ensure ongoing compliance with the General Permit. *Id.*

146.   Information derived from the MIP informs each permittee as to whether it must adapt BMP design or implementation to ensure that storm water and non-storm water discharges comply with the General Permit. General Permit, §§ X.I, XI.

147.   The MIP is an essential component in the General Permit's mandatory iterative self-evaluation process whereby permittees must implement BMPs contained in the SWPPP, evaluate BMP effectiveness using visual observation and storm water sampling data, and then revise BMPs as necessary to consistently comply with the General Permit's substantive mandates.

148.   The MIP must include monthly visual observations of storm water discharges and documentation of pollutants present, as well as storm water sampling from each location where storm water is discharged from its facility. General Permit, § XI.A.

149.   Observations must document the presence of any floating and suspended

material, oil and grease ("O&G"), discolorations, turbidity, odor and identify the source of any pollutants. General Permit, § XI(A)(2).

150.   Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants from coming into contact with storm water and discharging to waters of the United States. General Permit, § XI.A.3.

151.   The General Permit requires permittees to collect storm water samples from each location where storm water is discharged from its facility. General Permit, § XI.B.4.

152.   The General Permit requires permittees to collect and analyze storm water samples from two Qualifying Storm Events within the first half of each Reporting Year (July 1 to December 31), and two Qualifying Storm Events within the second half of each Reporting Year (January 1 to June 30). General Permit, § XI.B.2.

153.   The General Permit alternatively allows permittees to participate in Compliance Groups. General Permit, § XIV.

154.   Compliance Group participants are only required to collect and analyze storm water samples from one Qualifying Storm Event within the first half of each reporting year (July 1 to December 31) and one Qualifying Storm Event within the second half of the reporting year (January 1 to June 30). General Permit, § XI.B.3.

155.   The General Permit requires permittees to submit all sampling and analytical results for every sample via the State Board's online NPDES reporting database system—Stormwater Multiple Application and Report Tracking System ("SMARTS")—within thirty (30) days of obtaining each analytical report from a

1    certified laboratory. General Permit, § XI.B.11.a.

2        156.   Permittees must analyze each sample for as many as five sets of

3    pollutants, including: 1) conventional pollutants (pH, TSS, and either total organic

4    carbon or O&G), General Permit, §§ XI.B.6.a-b; 2) facility-specific pollutants

5    identified in the pollutant source description and evaluation process, e.g. plastics,

6    General Permit, § XI.B.6.c; 3) pollutants for which the Receiving Waters are impaired

7    ("Receiving Water Impairment Pollutants"), General Permit, § XI.B.6.e; 4) Standard

8    Industrial Classification code-based parameters listed in the General Permit at Table

9    1, which are pollutants common to discharges from particular industrial activities,

10   General Permit, § XI.B.6.d; and 5) Regional Board-mandated parameters, which are

11   any additional pollutants identified by the relevant Regional Board, General Permit, §

12   XI.B.6.f.

13       157.   The General Permit requires permittees submit an Annual Report to the

14   relevant Regional Board by July 1 of each year, which had to include, *inter alia*, all

15   records collected in the MIP and the Compliance Evaluation.

16       158.   The General Permit requires permittees to submit a Compliance

17   Checklist with each Annual Report that contains the following: 1) an indication of

18   whether the permittee complies with, and has addressed all applicable requirements

19   of, the General Permit; 2) an explanation for any noncompliance with requirements

20   within the reporting year, as indicated in the Compliance Checklist; and 3) an

21   identification, including page numbers and/or sections, of all revisions made to the

22   SWPPP within the reporting year; and 4) the date(s) of the annual Compliance

23   Evaluation. General Permit, § XVI.

COMPLAINT                               28

159.   Section XXI.N of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both.

160.   Permittees that fail to develop and implement an adequate MIP that includes both visual observations and sampling and analysis are in violation of the General Permit. General Permit, § II.J.3.

## V.    STATEMENT OF FACTS

161.   Diversified is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

162.   Diversified owns and operates the Facility located at 2345 Statham Boulevard in Oxnard, California (93033).

163.   The Facility is engaged in the in custom design, engineering, and manufacturing of cold storage buildings and refrigeration systems.

164.   The Facility is approximately 5.5 acres.

165.   The Facility conducts some industrial activity inside its warehouse. Other industrial activities are conducted outdoors.

166.   Outdoor activities include, but are not limited to, the storage, transportation and processing of significant quantities of EPS.

167.   EPS is stored outdoors at the Facility in large blocks (approximately 1' x 4' x 10') in an approximately 0.75 acres area located to the South of the warehouse adjacent to Statham Boulevard.

168.   Diversified cuts, splits and breaks EPS into smaller sizes appropriate to each customer application during its construction of cold storage panels and doors, walk-in coolers, refrigeration systems, and grow rooms.

169.   During rain and wind events, pieces of EPS ranging from the size of softballs to individual EPS pellets escape the Facility.

170.   EPS plastic is a pollutant under the Act. *See* 33 U.S.C. § 1362(6); *see also* 40 C.F.R. 122.2.

171.   EPS plastic improperly discarded by wind and storm water flows from the Facility constitutes trash for purposes of enforcement of the General Permit.

172.   According to publicly available information, including the State Board's online database for NPDES program compliance filings ("SMARTS"), the Facility has never filed an NOI or otherwise enrolled in the General Permit since beginning industrial activities.

173.   Diversified has never sought or received coverage under the General Permit for storm water discharges associated with industrial activities.

174.   Storm water discharges from the Facility, therefore, are unpermitted.

175.   Oxnard's population is 85% people of color (74 percent Hispanic/Latinx) with nearly half of all adults having less than a high school education.

176.   As a low-income, predominantly immigrant community, Oxnard has long been used as the dumping ground for the Central Coast's most polluting industries.

177.   The city ranks in the top 20 percent of the most environmentally burdened communities in the state, with some parts of the city ranking within the top 10 percent, according to the California Environmental Protection Agency

1   ("CalEPA").

2      178.   The Facility's adverse impacts, therefore, significantly and

3   disproportionately effect Hispanic/Latinx community members.

4      179.   Facilities with industrial activity classified as SIC code 3585 are subject

5   to General Permit regulation, i.e. must enroll in and comply with all terms and

6   conditions. General Permit, Attachment A.

7      180.   SIC code 3585 facilities must obtain General Permit coverage for all

8   areas of a facility at which industrial activity takes place.

9      181.   The General Permit requires facilities classified under SIC code 3585 to

10  analyze storm water samples for, *inter alia*, iron, aluminum, and zinc. General

11  Permit, § XI.B.6.d; Table 1.

12     182.   While some industrial processes occur under roof, each of the Facility's

13  industrial processes has the potential to contribute conventional and/or toxic

14  pollutants to storm water discharged to the Receiving Waters.

15     183.   Each of the industrial processes undertaken by Diversified at the Facility

16  is a pollutant source that, pursuant to the General Permit, must be disclosed, assessed,

17  and controlled to prevent or limit pollutant concentrations in storm water discharges.

18     184.   Storm water flowing over the Facility collects suspended sediment, dirt,

19  metals, EPS, and other pollutants, which are discharged to the Receiving Waters.

20     185.   EcoRights' investigation has determined that storm water and comingled

21  pollutants are conveyed from the Facility onto Statham Boulevard from no fewer

22  than two discharge locations.

23     186.   Once on Statham Boulevard, polluted storm water flows south toward

Channel Islands Boulevard.

187. At the intersection of Statham and Channel Islands Boulevards, storm water and comingled pollutants enter one of several municipal separate storm sewer system ("MS4") inlets which direct flows a short distance (less than 0.25 miles) into the Oxnard Drain.

188. Once in the Oxnard Drain, the Facility's storm water and comingled pollutants are discharged to the Ormond Beach Wetlands, onto Ormond Beach, into coastal marine waters, and ultimately reach the Pacific Ocean (collectively the "Receiving Waters").

189. According to the 303(d) List, the Oxnard Drain and Ormond Beach Wetlands are impaired for both pH and trash.

190. The Ormond Beach area is approximately 1,500-acres and is composed of a coastal ecosystem, beaches, sand dunes, wetlands, streams, as well as some agricultural and industrial land uses.

191. The Ormond Beach area was once the location of the Chumash Native American villages of Wenemu, Kanaputeqnon, and Kasunalmu.

192. This two milelong beach, sand dune, and wetlands ecosystem ("Ormond Beach Wetlands") extends from Port Hueneme, through Oxnard and the Ormond Beach Lagoon, to the northwestern boundary of Pt. Mugu Naval Air Station, which encompasses Mugu Lagoon.

193. Although much of the wetlands have been drained, filled and degraded over the past century, the Ormond Beach Wetlands are one of the few areas in southern California with an intact dune transition zone-marsh system.

194.   The Ormond Beach Wetlands ecosystem hosts more shorebird species—at least 200—than any other site in Ventura County.

195.   In addition, the Ormond Beach Wetlands are home to eight federal and state listed endangered and threatened species under the Federal Endangered Species Act[6] ("ESA") and California Endangered Species Act[7] ("CESA"), including the Tidewater Goby, Western Snowy Plover, California Least Tern, California Brown Pelican, American Peregrine Falcon, Lightfooted Clapper Rail, Least Bell's Vireo, and Belding's Savannah; 16 state and federal species of special concern; ospreys; kites; great blue herons; egrets; kestrels; sandpipers; white tundra swans that stop by on their way south from Alaska; and 40 state and federal special status plant species.

196.   A critical mass of restored wetlands and associated habitat at the Ormond Beach Wetlands is expected to create a self-sustaining biological system and enough tidal prism and flushing action to maintain health and hydrologic function.

197.   Anticipated restoration at the Ormond Beach Wetlands would include expansion of the wetlands to mirror their historic extent; pollutant free wetlands that do not harm or pose threats to humans and aquatic, benthic, plant and avian wildlife; and modifications of wetlands hydrology to restore tidal action and bring back freshwater flows that had formerly drained across the Oxnard Plain to the coastal wetlands.

198.   When integrated with the adjoining 900 acres of freshwater wetlands and the 1,500 acres at Mugu Lagoon, the Ormond Beach Wetlands could be the largest

---

[6] Federal Endangered Species Act, 7 U.S.C. § 136, 16 U.S.C. § 1531 et seq.

[7] California Endangered Species Act, California Fish & Game Code §§ 2050, et seq.

coastal wetland in southern California, spanning nine miles of the coast from Point Hueneme to Point Mugu.

199.   The Ormond Beach Wetlands are considered by wetland experts to be the most important wetland restoration opportunity in Southern California.

200.   Unlike other coastal wetland restoration projects in Southern California, there is room to restore the approximate extent of historic wetlands, and to provide surrounding upland habitat to complete the ecosystem and to accommodate sea level rise.

201.   The biological significance of this area has been recognized, and its restoration potential endorsed by all of the federal and state resource agencies that participate in the Southern California Wetlands Recovery Project.

202.   The Regional Board issued the "Water Quality Control Plan—Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura County" ("Basin Plan").[8] The Basin Plan identifies potential and existing Beneficial Uses of the Receiving Water, which include, but are not limited to: Water Contact Recreation, Non-Contact Water Recreation, Rare, Threatened, or Endangered Species, Wildlife Habitat, Estuarine Habitat, and Wetland Habitat. *See* Basin Plan, Table 2-1.

203.   The Receiving Waters are each a water of the United States.

204.   Diversified stores industrial materials and conducts industrial activities at the Facility without adequate BMPs, including, but not limited to, exposure

_____

[8] *See* http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/basin_plan_documentation.html.

minimization BMPs (e.g. storm resident canopies, storm water containment structures), in violation of the General Permit.

205.   Based on EcoRights' investigation—including field visits, a review of documents obtained through the Public Records Act from the City of Oxnard, extensive internet research, storm water discharge observations, storm water sampling and analysis, and an evaluation of satellite imagery—storm water containing pollutants is discharged from the Facility without coverage under the General Permit, and/or in violation of each of the General Permit's terms and conditions each time rainfall at the Facility exceeds 0.1 inches.

206.   Diversified has never obtained coverage under the General Permit, or an individual NPDES permit, for the discharge of storm water associated with industrial activity at the Facility.

207.   Accordingly, Diversified is liable for ongoing, daily violations of the Act's prohibition of unpermitted discharges from February 18, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

208.   Diversified has failed and continues to fail to comply with the General Permit's Discharge Prohibitions by discharging storm water in violation of the terms of the General Permit, as well as in violation of statewide water quality control plans and policies, e.g., the ISW Plan's prohibition on the discharge of trash/plastic to surface waters or deposition of trash where it may be discharged to surface waters.

209.   Accordingly, Diversified is liable for violations of the Act and General Permit's Discharge Prohibitions for each day of significant (i.e. greater than 0.1

inches) rainfall from February 18, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

210. Diversified has not implemented BMPs that comply with the BAT/BCT standard, in violation of the Act and General Permit.

211. Storm water sampling data collected at the Facility on March 12, 2020 and January 28, 2021 indicates that the concentrations of aluminum, iron and zinc exceeded the EPA Benchmark standards for those pollutants (see Table 2).

TABLE 2: POLLUTANT CONCENTRATIONS IN 3/12/2020 STORM WATER SAMPLE

| Pollutant | Results | Date | EPA Benchmark | CTR (Criteria Maximum Concentration) |
|-----------|---------|------|---------------|--------------------------------------|
| Iron | 1.44 mg/L | 3/12/2020 | 1.0 mg/L | n/a |
| Aluminum | 1.01 mg/L | 3/12/2020 | 0.75 mg/L | n/a |
| Zinc | 0.124 mg/L | 3/12/2020 | 0.117 mg/L | 0.12 mg/L |
| Iron | 1.84 mg/L | 1/28/2021 | 1.0 mg/L | n/a |
| Aluminum | 1.50 mg/L | 1/28/2021 | 0.75 mg/L | n/a |
| Zinc | 0.217 mg/L | 1/28/2021 | 0.117 mg/L | 0.12 mg/L |

212. Exceedances of EPA Benchmarks establish that Diversified has failed and continues to fail to develop and/or implement pollution prevention measures at the Facility that comply with the General Permit's technology-based Effluent Limitations, i.e., the BAT/BCT mandate.

213. EcoRights' investigation—including observations, videos and photos of EPS foam pieces being discharged from the Facility during both wet and dry weather—demonstrates Diversified's failure to implement even basic pollution prevention techniques for its outdoor storage of EPS plastics, which further confirms the Facility's failure to comply with the BAT/BCT standards.

214.   Accordingly, Diversified is liable for ongoing, daily violations of the Act and General Permit's technology-based Effluent Limitations from February 18, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

215.   Diversified has violated and continues to violate the General Permit's Receiving Water Limitations. Specifically, polluted storm water discharges from the Facility containing EPS plastic causes and contributes to exceedances of applicable WQSs, adversely affects human health and the environment, and threatens to cause pollution and/or a public nuisance.

216.   Accordingly, Diversified is liable for violations of the Act and General Permit's Receiving Water Limitations for each day of significant (i.e. greater than 0.1 inches) rainfall from February 18, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

217.   Diversified has violated and continues to violate the General Permit's special requirements on plastics by failing to design and implement plastic pollution prevention measures consistent with those required under the General Permit.

218.   Accordingly, Diversified is liable for ongoing, daily violations of the Act and General Permit's special requirements for plastics pollution from February 18, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

219.   Diversified has violated and continues to violate the General Permit's SWPPP requirements by failing to develop or implement a SWPPP.

220.   Accordingly, Diversified is liable for ongoing, daily violations of the Act

and General Permit's SWPPP requirements from February 18, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

221.   Diversified has violated and continues to violate the General Permit's MIP requirements by failing to develop or implement a MIP.

222.   Accordingly, Diversified is liable for ongoing, daily violations of the Act and General Permit's MIP requirements from February 18, 2016 to the present, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

223.   Diversified has violated and continues to violate the General Permit's ACFCE requirements. Diversified has failed to conduct any ACFCE's between 2016 and the present.

224.   Accordingly, Diversified is liable for an annual violation of the Act and General Permit's ACFCE requirements over the last five (5) years, and civil penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

## VI.        CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendant's Discharges from the Facility Without
General Permit Coverage Constitute Unpermitted Discharges
and are Violations of Section 301(a) of the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

225.   EcoRights re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

226.   Diversified has failed, and continues to fail, to obtain coverage under the General Permit for the discharge of storm water associated with industrial activity at

1    the Facility.

2        227.   Since at least February 18, 2016, Defendant has discharged contaminated

3 storm water associated with industrial activity at the Facility without General Permit

4 coverage.

5        228.   Each and every discharge of polluted storm water and/or unauthorized

6 non-storm water discharges from the Facility without General Permit coverage is a

7 separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

8        229.   Defendant's violations of section 301(a)'s requirement that discharges of

9 storm water associated with industrial activity be permitted are ongoing and continuous.

10        230.   Diversified is subject to an assessment of civil penalties for each and

11 every violation of the General Permit and Act occurring from February 18, 2016 to

12 the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d),

13 1365; 40 C.F.R. § 19.4.

14        231.   An action for injunctive relief is authorized by section 505(a) of the Act.

15 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

16 would irreparably harm EcoRights and the residents of the State of California, for

17 which there is no plain, speedy, or adequate remedy at law.

18        232.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

19 because an actual controversy exists as to the rights and other legal relations of the

20 Parties.

       WHEREFORE, EcoRights prays for judgment against Defendant as set forth

21 hereafter.

22                      **SECOND CAUSE OF ACTION**

23

**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Section III.A Discharge Prohibition and the Act**

COMPLAINT                                      39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

233.    EcoRights re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

234.    The General Permit proscribes all discharges of storm water to waters of the United States expect as specifically authorized by the General Permit or another NPDES permit. General Permit, § III.A.

235.    Since at least February 18, 2016, Defendant has discharged contaminated storm water from the Facility containing elevated concentrations of metals and significant quantities of trash/plastics without authorization under the General Permit or another NPDES permit.

236.    Diversified is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from February 18, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

237.    An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm EcoRights and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

238.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, EcoRights prays for judgment against Defendants as set forth hereafter.

# THIRD CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation
of the General Permit's Section III.C Discharge Prohibitions and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

239.   EcoRights re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

240.   The General Permit proscribes storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code. General Permit, § III.C.

241.   Since at least February 18, 2016, Defendant has discharged contaminated storm water from the Facility containing elevated concentrations of metals and significant quantities of trash/plastics that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code.

242.   Diversified is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from February 18, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

243.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm EcoRights and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

244.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

1    WHEREFORE, EcoRights prays for judgment against Defendants as set forth

2    hereafter.

## FOURTH CAUSE OF ACTION

3

### Defendant's Discharges of Contaminated Storm Water in Violation
### of the General Permit's Section III.D Discharge Prohibitions and the Act
### (33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))

4

5

6    245.   EcoRights re-alleges and incorporates all of the preceding paragraphs as

7    if fully set forth herein.

8    246.   The General Permit proscribes discharges that violate discharge

9    prohibitions contained in applicable Basin Plans, or statewide water quality control

10   plans and policies. General Permit, § III.D.

11   247.   The ISW Plan contains the following narrative Water Quality Objective:

12   "Trash shall not be present in inland surface waters, enclosed bays, estuaries, and

13   along shorelines or adjacent areas in amounts that adversely affect beneficial uses or

14   cause nuisance."[9]

15   248.   The ISW Plan contains the following Prohibition on Discharge: "The

16   discharge of trash to surface waters of the State or the deposition of trash where it may

17   be discharged into surface waters of the State is prohibited." [10]

18   249.   Since at least February 18, 2016, Defendant has discharged contaminated

19   storm water from the Facility containing significant quantities of trash/plastics in

20   violation of the ISW Plan's water quality objectives, and the ISW Plan's prohibition

21   on the discharge of trash to surface waters or disposition of trash where it may be

22

23

[9] See https://www.waterboards.ca.gov/water_issues/programs/trash_control/.
[10] See https://www.waterboards.ca.gov/water_issues/programs/trash_control/.

discharged to surface waters in violation of the General Permit's Discharge Prohibitions.

250.   Diversified is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from February 18, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

251.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm EcoRights and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

252.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, EcoRights prays for judgment against Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of the General Permit's Receiving Water Limitations and the Act (33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

253.   EcoRights re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

254.   Since at least February 18, 2016, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants, including specifically plastic/trash and metals, that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's Section VI.A Receiving Water

1    Limitation.

2           255.   Defendant has and continues to discharge storm water containing levels of

3    zinc that exceed the CTR standards, including specifically on March 12, 2020 and

4    January 28, 2021. See Table 2 above.

5           256.   Defendant has and continues to discharge storm water containing

6    significant quantities of EPS plastic/trash in violation of the Basin Plan's narrative

7    Water Quality Objective: "Waters shall not contain floating material, including solids,

8    liquids, foams, and scum, in concentrations that cause nuisance or adversely affect

9    beneficial uses." In addition to violating the specific objective, Defendant's discharges

10   of plastic/trash cause a condition of nuisance.

11          257.   Defendant has and continues to discharge storm water containing

12   significant quantities of EPS plastic/trash in violation of the ISW's narrative Water

13   Quality Objective: "Trash shall not be present in inland surface waters, enclosed bays,

14   estuaries, and along shorelines or adjacent areas in amounts that adversely affect

15   beneficial uses or cause nuisance."

16          258.   Since at least February 18, 2016, Defendant has discharged contaminated

17   storm water from the Facility containing levels of pollutants, including specifically

18   plastic/trash and metals, that adversely impact human health and the environment in

19   violation of the General Permit's Section VI.B Receiving Water Limitation.

20          259.   Since at least February 18, 2016, Defendant has discharged contaminated

21   storm water from the Facility containing levels of pollutants, including specifically

22   plastic/trash and metals, that threaten to cause pollution or a public nuisance in

23   violation of the General Permit's Section VI.C Receiving Water Limitation.

COMPLAINT                                    44

260. EcoRights is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards, adversely impact human health and/or the environment, and threaten to cause pollution or a public nuisance from the Facility, occur each time storm water discharges from the Facility.

261. Defendant's violations of the General Permit's Receiving Water Limitations are ongoing and continuous.

262. Each and every violation of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

263. Every day, since at least February 18, 2016, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

264. Diversified is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from February 18, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

265. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm EcoRights and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

266. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, EcoRights prays for judgment against Defendants as set forth hereafter.

### SIXTH CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of the General Permit's Effluent Limitations and the Act (33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

267.   EcoRights re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

268.   Diversified has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve the technology-based BAT/BCT pollution reduction standards.

269.   Diversified discharges storm water from the Facility containing concentrations of pollutants exceeding what is achievable through the implementation of BAT/BCT levels of control during every significant rain event.

270.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

271.   Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are

1    discharged from the Facility.

2         272.   Each and every violation of the General Permit's technology-based

3    pollution control standard is a separate and distinct violation of section 301(a) of the

4    Act. 33 U.S.C. § 1311(a).

5         273.   Defendant's violations of the General Permit's technology-based pollution

6    control standard and the Act are ongoing and continuous.

7         274.   Diversified is subject to an assessment of civil penalties for each and

8    every violation of the General Permit and Act occurring from February 18, 2016 to

9    the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d),

10   1365; 40 C.F.R. § 19.4.

11        275.   An action for injunctive relief is authorized by section 505(a) of the Act.

12   33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

13   would irreparably harm EcoRights and the residents of the State of California, for

14   which there is no plain, speedy, or adequate remedy at law.

15        276.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

16   because an actual controversy exists as to the rights and other legal relations of the

17   Parties.

18        WHEREFORE, EcoRights prays for judgment against Defendant as set forth

19   hereafter.

### SEVENTH CAUSE OF ACTION

20

**Defendant's Failure to Comply with the General Permit's**
21
**Special Requirements for Abating Plastic Pollution**
22   **(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

23        277.   EcoRights re-alleges and incorporates all of the preceding paragraphs as

1   if fully set forth herein.

2       278.   Defendant has not developed and/or implemented a containment system,

3   or a suite of BMPs with equivalent effectiveness, for the management of plastics as

4   required by the General Permit.

5       279.   Defendant's violations of the General Permit's special requirements for

6   plastics are ongoing and continuous.

7       280.   Each day since February 18, 2016 that Defendant fails to develop a

8   containment system, or a suite of BMPs with equivalent effectiveness, for plastic

9   material at the Facility is a separate and distinct violation of the General Permit and

10   section 301(a) of the Act. 33 U.S.C. § 1311(a).

11       281.   Defendant has been in violation of the General Permit's special

12   requirements for plastics every day since February 18, 2016. Violations continue each

13   day that plastic materials are not properly managed at the Facility.

14       282.   Diversified is subject to an assessment of civil penalties for each and

15   every violation of the Act occurring from February 18, 2016 to the present, pursuant

16   to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

17       283.   An action for injunctive relief is authorized by section 505(a) of the Act.

18   33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

19   would irreparably harm EcoRights and the residents of the State of California, for

20   which there is no plain, speedy, or adequate remedy at law.

21       284.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

22   because an actual controversy exists as to the rights and other legal relations of the

23   Parties.

1      WHEREFORE, EcoRights prays for judgment against Defendant as set forth

2 hereafter.

3                       **EIGHTH CAUSE OF ACTION**

4 **Defendant's Failure to Prepare, Implement, Review, and Update**
**A Lawful Storm Water Pollution Prevention Plan**

5 **(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

6     285.   EcoRights re-alleges and incorporates all of the preceding paragraphs as

7 if fully set forth herein.

8     286.   Defendant has not developed and/or implemented a legally adequate

9 SWPPP for the Facility.

10     287.   Defendant's violations of the General Permit's SWPPP requirements are

11 ongoing and continuous.

12     288.   Each day since February 18, 2016 that Defendant has not developed,

13 implemented, and reviewed and updated a legally adequate SWPPP for the Facility is a

14 separate and distinct violation of the General Permit and section 301(a) of the Act. 33

15 U.S.C. § 1311(a).

16     289.   Defendant has been in violation of the General Permit's SWPPP

17 requirements every day since February 18, 2016. Violations continue each day that an

18 adequate SWPPP for the Facility is not developed and fully implemented.

19     290.   Diversified is subject to an assessment of civil penalties for each and

20 every violation of the Act occurring from February 18, 2016 to the present, pursuant

21 to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

22     291.   An action for injunctive relief is authorized by section 505(a) of the Act.

23 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm EcoRights and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

292.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, EcoRights prays for judgment against Defendants as set forth hereafter.

## NINTH CAUSE OF ACTION

**Defendant's Failure to Develop and Implement
a Lawful Monitoring and Reporting Program
(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

293.   EcoRights re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

294.   Defendant has not developed and implemented a legally adequate monitoring implementation plan, or MIP, for the Facility.

295.    Defendant's violations of the General Permit's MIP mandate are ongoing and continuous.

296.   Each day since February 18, 2016 that Defendant has not developed and implemented a lawful MIP for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

297.   Diversified is subject to an assessment of civil penalties for each and every violation of the Act occurring from February 18, 2016 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

1    298.   An action for injunctive relief is authorized by Act section 505(a).

2    33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

3    would irreparably harm EcoRights and the residents of the State of California, for

4    which there is no plain, speedy, or adequate remedy at law.

5    299.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

6    because an actual controversy exists as to the rights and other legal relations of the

7    Parties.

8    WHEREFORE, EcoRights prays for judgment against Defendants as set forth

9    hereafter.

### TENTH CAUSE OF ACTION

**Defendant's Failure to Submit Complete Annual Reports and
Accurately Certify Compliance in Violation of the General Permit and the Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

300.   EcoRights re-alleges and incorporates all of the preceding paragraphs as

if fully set forth herein.

301.   Defendant has not submitted annual reports or accurately certified

compliance with the General Permit in in any year since at least February 18, 2016.

302.   Diversified is subject to an assessment of civil penalties for each and

every violation of the Permit and Act occurring from February 18, 2016 to the present,

pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R.

§ 19.4.

303.   An action for injunctive relief is authorized by section 505(a) of the Act.

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm EcoRights and the residents of the State of California, for

1    which there is no plain, speedy, or adequate remedy at law.

2        304.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

3    because an actual controversy exists as to the rights and other legal relations of the

4    Parties.

5        WHEREFORE, EcoRights prays for judgment against Defendants as set forth

6    hereafter.

7                            **RELIEF REQUESTED**

8        Wherefore, Plaintiff respectfully requests that this Court grant the following

9    relief:

10       a.  Declare Defendant to have violated, and to be in violation of, the

11   General Permit and Act as alleged herein;

12       b.  Order Defendant to obtain General Permit coverage for the Facility;

13       c.  Enjoin Defendant from discharging polluted storm water from the

14   Facility except as authorized by the General Permit;

15       d.  Enjoin Defendant from further violating the procedural requirements of

16   the General Permit;

17       e.  Order Defendant to immediately implement storm water pollution

18   control technologies and measures that are equivalent to BAT or BCT, and that prevent

19   pollutants in the Facility's storm water from contributing to violations of any water

20   quality standards;

21       f.  Order Defendant to comply with the General Permit's monitoring and

22   reporting requirements, including ordering supplemental monitoring to compensate for

23   past monitoring violations;

g.  Order Defendant to prepare a SWPPP consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.  Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since August 23, 2014, up to and including November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015 pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4;

j.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

k.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

l.  Award any such other and further relief deemed appropriate by the Court.

DATED: April 25, 2021          Respectfully submitted,

By:   */s/ Jesse C. Swanhuyser*
Jesse C. Swanhuyser
Sycamore Law, Inc.
**Attorney for Plaintiff**