JS-6

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a public benefit non-profit corporation, | Case No. CV 21-3552-DMG (PVCx) |
| Plaintiff, | **CONSENT DECREE and FINAL JUDGMENT [19]** |
| vs. | |
| DIVERSIFIED PANELS SYSTEMS, INC., a California corporation, | |
| Defendant. | |

**WHEREAS**, Ecological Rights Foundation ("EcoRights" or "Plaintiff") is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in Garberville, California;

**WHEREAS**, EcoRights is dedicated to promoting rights to a clean, healthy, and diverse environment, and through research, education, and environmental law enforcement, EcoRights seeks to protect human and wildlife communities;

**WHEREAS**, Diversified Panels Systems, Inc. ("Diversified" or "Defendant") owns and operates a facility at 2345 Statham Boulevard in Oxnard, California ("Facility");

**WHEREAS,** EcoRights alleges in its Complaint (defined below) that storm water discharges associated with industrial activity at the Facility are subject to regulation by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 2014-57-DWQ as last amended on November 6, 2018 ("General Permit" or "Permit" [1]), and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA"), Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342;

**WHEREAS**, on April 26, 2021, EcoRights filed a complaint against Diversified in the Central District of California, Civil Case No. CV 21-03552 ("Complaint");

**WHEREAS**, on June 15, 2021, Diversified filed a Motion to Dismiss the Complaint;

**WHEREAS**, Plaintiff's Complaint alleged violations of the CWA and General Permit related to the discharge of pollutants from the Facility into storm drains and surface waters, allegedly including the Oxnard Industrial Drain, Ormond Beach Wetlands, coastal waters, and the Pacific Ocean;

**WHEREAS**, Diversified denies all allegations of violations set forth in the Complaint;

**WHEREAS**, Plaintiff and Defendant (collectively "Settling Parties" or "Parties," individually a "Party"), without either adjudication of Plaintiff's claims or any admission by Defendant of any alleged violation or other wrongdoing, believe it is in their mutual interest to enter into a Consent Decree setting forth terms and conditions appropriate to resolving the allegations set forth in the Complaint without further proceedings;

---

[1] References to the General Permit shall include the successor to the current General Permit, as applicable during the Term, where the context dictates.

**WHEREAS**, all actions taken by Defendant pursuant to this Consent Decree shall be made in compliance with all applicable federal, state and local laws and regulations;

**NOW, THEREFORE, IT HAS BEEN STIPULATED BETWEEN THE SETTLING PARTIES AND IS HEREBY ORDERED AND DECREED BY THE COURT AS FOLLOWS**:

1.   The Court has jurisdiction over the subject matter of this action and over the Parties consenting hereto pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A).

2.   Venue is appropriate in the Central District Court pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations are taking place is located within this District.

3.   Solely for purposes of enforcing this Consent Decree, the Complaint states a claim upon which relief may be granted against Defendant pursuant to Section 505 of the CWA, 33 U.S.C. § 1365.

4.   The Court shall retain jurisdiction over this action during the term of this Consent Decree for purposes of interpreting, modifying, and/or enforcing the terms of this Consent Decree.

I.   **OBJECTIVES**

5.   It is the express purpose of the Settling Parties through this Consent Decree to resolve in full all violations alleged by EcoRights in its Complaint, and for Diversified to comply with:  (i) all applicable sections of the Clean Water Act; and (ii) all applicable terms and conditions of the General Permit.

6.   In light of these objectives and as set forth fully below, the Parties agree to comply with the provisions of this Consent Decree.

## II.    AGENCY REVIEW AND CONSENT DECREE TERM

### A.    Agency Review of Consent Decree

7.    <u>Agency Review</u>.  Plaintiff submitted this Consent Decree to the United States Department of Justice and the United States Environmental Protection Agency (the "Federal Agencies") for agency review consistent with 40 C.F.R. § 135.5.

8.    <u>Court Notice</u>.  Plaintiff notified the Court that the Federal Agencies received the Parties' Proposed Consent Decree on July 27, 2021.

9.    <u>Entry of Consent Decree</u>.  Plaintiff submitted a letter provided by the United States Department of Justice notifying the Court that the United States has reviewed the proposed consent decree and does not object to its entry.  The Court therefore enters this Consent Decree.

### B.    Effective Date and Term of Consent Decree

10.    <u>Effective Date</u>.  The Effective Date of this Consent Decree shall be the date of entry by the Court.

11.    <u>Term & Termination</u>. This Consent Decree shall terminate without further action by the Parties on the later of:  (i) two (2) years from the Effective Date; (ii) the conclusion of any proceeding to enforce the Consent Decree initiated prior to two (2) years after the Effective Date; or (iii) the completion of any payment or other affirmative duty required by Defendant under this Consent Decree, other than ongoing compliance with the General Permit in the ordinary course of business (the "Term").

## III.    COMMITMENTS OF THE PARTIES

### A.    General Permit Enrollment

12.    Diversified has enrolled the Facility in the General Permit by filing a Notice of Intent form with the State Water Resources Control Board ("State Board") to obtain a Waste Discharge Identification Number ("WDID").

### B.    Storm Water Pollution Prevention Plan

13.   Diversified has prepared a Storm Water Pollution Prevention Plan ("SWPPP") that complies with Section X of the General Permit. EcoRights has reviewed, and has no comments on, the initial SWPPP as of the Effective Date.  The SWPPP is attached hereto as **Exhibit A**.

14.   The SWPPP contains a Monitoring Implementation Plan ("MIP") that complies with Section X.I. of the General Permit which, as implemented, ensures compliance with the monitoring requirements set forth in Section X.I. of the General Permit.  EcoRights has reviewed, and has no comments on, the initial MIP as of the Effective Date.

15.   <u>SWPPP Update and Review</u>.  Diversified shall prepare and submit to the State Board via SMARTS, and to EcoRights, an updated SWPPP no later than the first anniversary of the Effective Date.  Plaintiff shall be entitled to review and comment on any updated SWPPP and may propose modifications or additions to an updated SWPPP to the extent necessary to comply with the General Permit.  In the event Defendant contends that no changes to the then-current SWPPP are necessary to maintain compliance with the General Permit, Defendant shall provide a written explanation to EcoRights that justifies its decision to continue operating under the then-current SWPPP.

16.   Defendant shall incorporate Plaintiff's modifications or additions to any updated SWPPP within thirty (30) calendar days of notification of proposed changes, or justify in writing why any changes are not incorporated.

17.   After the Effective Date, in the event of any dispute regarding Defendant's incorporation of and/or responses to Plaintiff's proposed modifications or additions to a SWPPP, or regarding Defendant's decision not to modify the SWPPP, either Party may invoke the Dispute Resolution procedures set out in Section V of this Consent Decree.

**C.      Discharge Standards**

18.  Any unauthorized non-storm water discharges as defined in the General Permit from the Facility shall be a violation of this Consent Decree.

19.  The discharge of expanded polystyrene ("EPS") material from the Facility is prohibited, subject to all terms and conditions in this Consent Decree, including specifically Paragraph 57.

**D.      Storm Water Pollution Control Measures**

20.  Prior to the Effective Date, Diversified shall unplug the two (2) storm water drains in the storage yard as depicted on **Exhibit B** ("Facility Map") as D2 and D3.  During the Term, Diversified shall maintain the two drains to prevent re-plugging.

21.  Diversified shall install, and thereafter maintain proper functioning of, drain filters on both drains (D2 and D3) identified in Paragraph 20 and on Exhibit B, capable of capturing or otherwise preventing the discharge of suspended and floating particulate, including EPS material.  The initial filters to be used shall be the PIG Frameless Storm Drain Filters.  Should such filters become unavailable, or Diversified determines they are ineffective BMPs, Diversified shall use similar filters engineered to capture or otherwise prevent the discharge at D2 or D3 of EPS material greater than or equal to 1 millimeter (cross-section) in size.

22.  When unloading EPS material arriving for use at the Facility, Diversified shall use extreme care to avoid fragmenting the material.   Diversified shall promptly capture by manual sweeping, vacuuming, and/or a mechanical sweeper for larger areas EPS fragments generated during unloading.

23.  Diversified shall promptly move EPS material inside the production building from the unloading area.  When unloading and transport operations are complete, Diversified shall inspect the surrounding area and collect and remove remaining EPS fragments using manual sweeping, a vacuum, and/or a mechanical sweeper for larger areas.

24.  Diversified shall not hold outdoors for more than 24 hours any EPS material arriving for use at the Facility.

25.  Diversified shall promptly move metal materials (e.g., galvanized metal, steel) arriving for use inside the production building from the unloading area.

26. Diversified shall not hold outdoors for more than 24 hours any metal materials arriving for use at the Facility.

27. As of the Effective Date, Diversified shall:  (1) complete wrapping the ends of all finished products currently stored outdoors in the storage yard; (2) remove any DuPont material to indoors, or properly dispose of that DuPont material; (3) remove existing metal and wood debris stored outside of dumpsters in the outdoor storage yard; and (4) not deposit newly generated metal or wood debris in the storage yard, except in dumpsters.

28.  After the Effective Date, Defendant shall not use the outdoor storage yard to hold raw materials or products that are not related to Facility operations, maintenance, or construction.

29.  After the Effective Date, Diversified shall entirely wrap all finished products, including ends, before they leave the production building.

30.  Diversified shall inspect all outdoor areas of the Facility, particularly around the perimeter, at least once during each business day to determine whether EPS material fragments are found in outdoor areas of the Facility.  Diversified shall promptly remove EPS fragments observed by manual sweeping, vacuuming, and/or by mechanized sweeping for larger amounts.  In addition, at or near the end of each operating business day, Diversified shall conduct a final inspection of all outdoor areas of the Facility, particularly around the perimeter, to determine whether EPS material fragments are found in outdoor areas of the Facility.  Diversified shall promptly remove EPS fragments observed by manual sweeping, vacuuming, and/or by mechanized sweeping for larger amounts.  Diversified shall log its visual

observation of the Facility after the final inspection and, if applicable, after removal of EPS fragments, as of the end of the operating business day to document the Facility's condition.

31.   The Parties agree that, as of the Effective Date, manual sweeping, vacuuming or mechanized sweeping for larger amounts are technology-based Best Management Practices ("BMPs") that the Parties have identified and, when implemented properly, are expected to be effective to address EPS material fragments as a component of an integrated inspection and response suite of measures to mitigate discharge of pollutants due to industrial activities at the Facility.  During the Term, Defendant shall evaluate the effectiveness of its BMPs.  If new information becomes available to either Party indicating that BMPs are ineffective, new and/or modified BMPs shall be evaluated and implemented if necessary to comply with this Consent Decree and the General Permit.

32. For the first three (3) months after the Effective Date, Diversified shall take date-stamped photographs of at least five (5) locations as (approximately) marked on Exhibit B at the Facility, once per week (unless operations are shut down), to document the effectiveness of the BMPs in controlling EPS material fragments.  After the first three (3) months, at Diversified's election, compiling photographs can be reduced from weekly to monthly.

33.   For the first year of the Term, a Designated Employee (as defined below) shall monitor weather forecasts for the Facility using the WEATHER UNDERGROUND for zip code 93033 (wunderground.com).  If, at 8:00 a.m. on an operating business day there is a prediction of rainfall at the Facility in the next 24 hours at an estimated probability of greater than or equal to 60%, based on the "Today" and the "Tonight" readings on this website, then on that business day the Designated Employee shall conduct, or oversee the conduct of, an additional outdoor inspection and, as necessary, Diversified shall conduct manual sweeping, or

vacuuming, and/or mechanized sweeping for larger areas for EPS material fragments. This additional inspection shall be logged.  The additional inspection and BMP implementation shall not be required for consecutive days of rainfall, or for consecutive days of predicted rainfall, or more than twice in any week if rainfall continues for multiple days.

34.  Diversified shall provide one or more durable, sealed containers in which to store EPS material fragments accumulated in indoor sweeping, vacuuming, and/or mechanized collections, and properly dispose of the fragments so accumulated in the interior of the Facility.

35.  For EPS material fragments accumulated in outdoor sweeping, vacuuming or mechanized collections, Diversified shall contain such materials in a sealed bag or other closed receptacle and deposit such bag or other closed receptacle on the day of collection into the solid waste dumpster at the Facility.

36.  Diversified shall cover all dumpsters for metals, landscape debris, solid waste, and general trash in the storage yard when not in use with a rain resistant covering.

### E.    Employee Training

37. Training Program.  Prior to the Effective Date, Diversified shall review and revise its employee training program to ensure compliance with the requirements of this Consent Decree and the General Permit, including any training materials, as necessary, for implementation of the training program ("Training Program").  Such Training Program shall be detailed in the SWPPP.

38.  The Training Program shall provide:  (a) that there be a sufficient number of employees delegated to achieve compliance with this Consent Decree and the General Permit; and (b) that these employees are properly trained to perform the required compliance activities under this Consent Decree and the General Permit.

39.  The Training Program shall, at a minimum, include the following:

a.   <u>Non-Storm Water Discharge Training.</u>  Defendant shall train all non-clerical employees in the General Permit's prohibition of non-storm water discharges so that employees know what non-storm water discharges are, how to detect them, how to prevent and stop them, and procedures for reporting non-compliance.

b.   <u>Employee Designation</u>.  Defendant shall designate (by position/title) employees for specific SWPPP implementation responsibilities ("Designated Employees").

c.   <u>Visual Observation Training</u>.  Defendant shall provide training to all individuals performing visual observations at the Facility pursuant to this Consent Decree and the General Permit.

d.   <u>Monitoring Training</u>.  Defendant shall train all Designated Employees on the technical protocols, including any chain of custody requirements, to ensure storm water samples are timely and properly collected, stored, and submitted to a certified laboratory.

40. <u>Language</u>.  The training and training materials shall be available and offered in the language(s) in which relevant employees are conversant.

41.  Prior to the Effective Date, an initial staff training shall be provided by a Qualified Industrial Storm Water Practitioner (as defined in Section IX.A. of the General Permit) familiar with the requirements of this Consent Decree and the General Permit.  Future Training Program episodes may be provided by employees familiar with the requirements of this Consent Decree, the General Permit, and the Facility's SWPPP.

42. Defendant shall maintain training records to document compliance with the training obligations herein, and shall provide EcoRights with a copy of these records within ten (10) business days of receipt of a written request.

**F.    Compliance Monitoring and Reporting**

43. <u>BMP Performance Verification</u>.  During the Term of the Consent Decree, Diversified shall maintain logs of BMP implementation, as well as other records as specified herein, to demonstrate compliance with the Consent Decree and the effectiveness of the BMPs.

44. Plaintiff may request information required to be maintained under this Consent Decree or the General Permit (e.g., training logs, storm water monitoring data) from Diversified no more than twice per year.  Defendant shall provide such information within ten (10) business days of receiving EcoRights' request.

45.  During the Term of the Consent Decree, Diversified shall collect and analyze two (2) storm water discharge samples from Qualifying Storm Events ("QSE") between July and December, and two (2) storm water discharge samples from QSEs between January and June, subject to the terms and conditions of the General Permit governing collection of such discharge samples, including provision for circumstances if sufficient QSE's do not occur during either six month term.

46.  Diversified shall collect storm water samples from at least two discharge locations—including Discharge Point 1 (D1), and either Discharge Point 2 (D2) or Discharge Point 3 (D3). The (approximate) location of the three storm water sample discharge and collection points for the Facility are depicted on Exhibit B as "D1," D2," and "D3."

47.  Defendant shall monitor and document compliance with the discharge standard at Paragraph 19 at point D1, including with at least one photograph documenting the discharge at the time samples are collected, and via visual observations at the time samples are collected, that confirm there is no visible EPS material exiting the Facility to Statham Boulevard.  Defendant shall complete contemporaneous written records for all observations attesting that no EPS material was observed at D1.

48. No storm water sampling shall be conducted in the North driveway at the Facility unless in the future Diversified conducts industrial activities in areas that drain into the North driveway.

49. All storm water samples from the Discharge Points shall be analyzed for parameters as determined by the comprehensive storm water pollutant source assessment pursuant to Diversified's SWPPP. As of the Effective Date those parameters include total suspended solids, oil and grease and pH.

50. During the Term, Diversified shall, in addition to parameters identified above, analyze all storm water samples for additional pollutants, if any, to the extent identified in the pollutant source assessment conducted as part of an annually updated SWPPP as required by General Permit Section XI.B.6.c.

51. During the Term Diversified shall provide to EcoRights storm water sampling results uploaded to SMARTS and, if applicable, the Exhibit C calculations, at the same time the results are reported to SMARTS.

52. Nothing in this Consent Decree shall limit Diversified from conducting sampling of any kind at the Facility for purposes other than this Consent Decree and EcoRights agrees and acknowledges that unless such sampling is of storm water discharge, EcoRights is not entitled to such results.

53. Upstream impervious surfaces, including at the Iron Mountain (2345 Statham Boulevard) and Dixieline Lumber (2325 Statham Boulevard) facilities contribute storm water "run-on" to the Facility's storm water discharges. Accordingly, Diversified shall sample at least two "run-on" sample locations for purposes of documenting the composition of relevant pollutants in "run-on" storm water approximately contemporaneously with sampling storm water at the Discharge Points. One "run-on" sampling location which shall be sampled is marked as R1 on Exhibit B. Two alternative "run-on" sampling locations are marked on Exhibit B as R2 and R3. Diversified may elect to collect a "run-on" sample at either R2 or R3,

provided the paired Discharge Point sample (D2 or D3 on Exhibit B) is collected at the corresponding drain directly downgradient of the "run-on" sampling location.

54.   Using impervious surface area as a surrogate for storm water flow volume, the Parties have determined the relative contribution of "run-on" flow volume upstream of Diversified's Facility.  The sample calculations set forth in **Exhibit C** exemplify how Diversified may take into account the total volume of water and pollutants flowing on to, and then off of, the Facility.  The formulae at Exhibit C may be used to calculate Diversified's contribution to the discharges sampled at the Discharge Points.

55.   Where analyses of storm water collected at the Facility's Discharge Points establish an exceedance of the applicable instantaneous or annual Numeric Action Levels ("NALs") (as defined at Section XII of the General Permit), Diversified shall, based on the applicable formulae at Exhibit C, determine its relative contribution of pollutants to the storm water discharges at the Discharge Points.  Diversified shall provide EcoRights with a copy of the "run-on" sampling results and the Exhibit C calculations if Diversified conducts such calculations.  No such calculations are necessary if there are no exceedances of applicable NALs at the Discharge Points.

56.   The calculations conducted based on the formulae at Exhibit C shall be used to determine the Facility's compliance with the General Permit's Level 1 ERA Report requirement, General Permit, Section XII.C., and to establish Diversified's relative contribution of pollutants to storm water at the Discharge Points for use in any "Non-Industrial Pollutant Source Demonstration," as necessary.  General Permit, Section XII.D.2.b.

57.   <u>EPS Discharge Compliance</u>.  Compliance with the discharge prohibition set forth in Paragraph 19 above shall be determined as follows:

a.      The first discharge of EPS from the Facility that is observed and documented by either Party outside of operating day business hours[2] during the Term shall trigger the meet and confer process set out in Paragraphs 67 and 68. Diversified shall determine the cause of the discharge, and propose modifications or additions to an updated SWPPP to the extent necessary to eliminate the discharge. Plaintiff shall review and comment on any updated SWPPP and may propose modifications or additions to an updated SWPPP necessary to eliminate the discharge. Defendant shall incorporate Plaintiff's modifications or additions to any updated SWPPP within thirty (30) calendar days of notification of proposed changes, or justify in writing why any changes are not incorporated.

b.      A second discharge of EPS from the Facility that is observed and documented by either Party outside of operating day business hours during the Term is a breach of this Consent Decree, subject to dispute resolution as set out in Section IV, Paragraphs 67, 68, 69, and 70 of this Consent Decree.

58. <u>Site Inspection</u>.  Plaintiff may inspect the Facility once per year during the Consent Decree Term.

59. <u>Site Inspection Notice</u>.  Site inspection shall occur Monday through Friday between 9:00 a.m. and 4:00 p.m.  EcoRights will provide Defendant with no less than two (2) business days' notice prior to a dry weather inspection; and no less than twenty-four (24) hours' notice prior to a wet weather inspection.  Notice will be provided by telephone and electronic mail to the individual(s) designated below at Paragraph 86.

60. <u>Inspection Details</u>.  EcoRights shall limit inspection participants to three individuals, all of whom agree to execute a reasonable liability waiver and agree to

---

[2] The Facility typically operates  from 6:30 a.m. to 4:30 p.m. Monday through Thursday, and occasionally on Fridays.

existing safety and visitor protocols prior to entering the Facility.  Plaintiff's representatives shall be permitted to take photographs.  Any photos taken by Plaintiff during an inspection shall be provided to Defendant within five (5) days of the inspection.  Plaintiff agrees that during the Term it shall not collect any storm water samples in respect of the Facility without prior notification to Defendant and an opportunity for Defendant to observe and to collect contemporaneous samples, provided the Parties agree to use uniform methodologies so the samples are comparable.  In the alternative, the Parties may agree to take split samples.  The Parties shall exchange their sampling results within five (5) calendar days of receipt of laboratory reports.

61.  <u>Document Provision</u>.  During the Term, Defendant shall:

a.  copy Plaintiff on all documents and written communications submitted to the Los Angeles Regional Water Quality Control Board, the State Board, and/or any Federal, State, local agency, county, or municipality that are related to compliance with the General Permit and/or this Consent Decree, excepting payment of invoices; and

b.  provide Plaintiff with all documents and written communications related to compliance with the General Permit and/or this Consent Decree that are individually addressed to Defendant (e.g., excluding general informational emails or notifications distributed to the interested public) and received by Defendant from any Federal, State, local agency, county, or municipality within ten (10) business days of receipt by Defendant.

62.  <u>Compliance Monitoring</u>.  Defendant agrees to partially defray costs associated with Plaintiff's monitoring of Defendant's compliance with this Consent Decree during the Term by paying eight thousand dollars ($8,000.00) within thirty (30) business days of the Effective Date.  The payment shall be made to the Sycamore

Law Attorney Client Trust Account, 1004 O'Reilly Avenue, San Francisco, California, 94129.

### G.    Environmental Mitigation and Litigation Fees and Cost

63. <u>Environmental Mitigation Project</u>.  Within thirty (30) business days of the Effective Date, Defendant agrees to make a payment of forty-five thousand dollars ($45,000.00) to the Rose Foundation for environmental mitigation projects (the "Environmental Mitigation Project").  The payment shall be mailed via certified mail or overnight delivery to: Rose Foundation, ATTN:  Ecological Rights Foundation v. Diversified Panels Systems, 201 4th Street, Ste. 102, Oakland, California 94607.

64. Environmental Mitigation Project funds will be used to support one or more environmental projects related to water quality in the Oxnard area, and designed to analyze, reduce, prevent, and/or otherwise mitigate the ecological or public health effects of industrial storm water and/or non-storm water discharges.

65. Prior to the Effective Date, EcoRights shall provide a copy of this Consent Decree to the Rose Foundation requesting a letter to the Department of Justice confirming the Rose Foundation's intent to disburse Environmental Mitigation Project funds consistent with the Consent Decree.  EcoRights promptly shall provide a copy of any such letter, and any response from the Department of Justice it receives, to Diversified.

66. <u>Plaintiff's Fees and Costs</u>.  Within thirty (30) business days of the Effective Date, Defendant agrees to pay a total of eighty-five thousand dollars ($85,000.00) to reimburse EcoRights for costs, including expert/consultant fees and costs, and partially reimburse EcoRights for reasonable attorneys' fees incurred as a result of investigating and filing the Complaint, and negotiating a resolution of this matter. Payment shall be delivered by certified mail or overnight delivery made payable to:

Sycamore Law Attorney Client Trust Account, 1004 O'Reilly Avenue, San Francisco, California, 94129.

## IV.   DISPUTE RESOLUTION

67.   This Court shall retain jurisdiction over this matter for the Term of this Consent Decree for the purposes of enforcing its terms and conditions, and adjudicating any and all disputes among the Parties that may arise relating to any provision of this Consent Decree.  The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

68. <u>Meet and Confer</u>.  Either Party may invoke the dispute resolution procedures of this Section IV by notifying the other Party in writing of the matter(s) in dispute, and of the disputing party's proposal for resolution.  The Parties shall then meet and confer in good faith (either telephonically or in person) within fourteen (14) business days of the date of the notice in an attempt to fully resolve the dispute.

69. <u>Motion</u>.  In the event the Parties cannot fully resolve the dispute within thirty (30) calendar days of the meet and confer described in paragraph 51, or within such longer period as they shall mutually agree, the Parties agree that the dispute may be submitted for formal resolution by filing a motion before the United States District Court for the Central District of California.  The Parties agree to request an expedited hearing schedule on the motion.

70.   In resolving any dispute arising from this Consent Decree before the Court, the Parties shall be entitled to fees and costs incurred pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C.§ 1365(d), applicable case law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## V.   RELEASE OF LIABILITY AND COVENANT NOT TO SUE

71. <u>Plaintiff's Waiver and Release of Defendant</u>.  In consideration of the above, upon the Effective Date, Plaintiff, on its own behalf and on behalf of its officers and

directors, employees, and direct affiliates, including their respective predecessors, successors and assigns, release Defendant, its officers, directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, insurers, landlords, lenders, predecessors, successors or assigns, agents, attorneys and other representatives, from and waives all claims that were or could have been raised based on the Complaint up to and including the date on which this Consent Decree terminates.

72. The Parties intend and agree that compliance with the terms of this Consent Decree shall constitute compliance with the CWA and the General Permit, with respect to the matters addressed in this Consent Decree.

73. Subject to the Parties' agreement in the immediately preceding Paragraph, nothing in this Consent Decree limits or otherwise affects either Party's rights to address or take any position that a Party deems necessary or appropriate in any informal or formal proceeding before the State Water Board, Regional Water Board, California EPA, U.S. EPA, or any other judicial or administrative body on any matter relating to Defendant's compliance at the Facility with the General Permit or the Clean Water Act.

## VI.   MISCELLANEOUS PROVISIONS

74. <u>No Admission of Liability</u>.  The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation on disputed claims.  Neither the Consent Decree nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation.  Defendant maintains and reserves all defenses it may have to any alleged violations that may be raised in the future by any person.

75. <u>Counterparts</u>.  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy,

electronic mail, and/or facsimile copies of an original signature shall be deemed to be originally executed counterparts of this Consent Decree.

76. <u>Authority</u>.  The undersigned representatives for Plaintiff and Defendant each certify that they are fully authorized by the Party whom they represent to enter into this Consent Decree.  A Party's signature to this Consent Decree transmitted by facsimile or electronic mail shall be deemed binding.

77. <u>Construction</u>.  The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the General Permit, the Clean Water Act, or specifically herein.  The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

78. <u>Full Settlement</u>.  This Consent Decree constitutes a full and final settlement and accord and satisfaction of the matters addressed herein.

79. <u>Integration Clause</u>.  This is an integrated Consent Decree.  This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

80. <u>Severability</u>.  In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

81. <u>Choice of Law</u>.  The laws of the United States shall govern this Consent Decree and, as applicable, California law.

82. <u>Negotiated Settlement</u>.  The Settling Parties have negotiated this Consent Decree, and agree that it shall not be construed against the Party preparing it, but shall be construed as if the Settling Parties jointly prepared this Consent Decree.  Any uncertainty and ambiguity shall not be interpreted against any one Party.

83. <u>Modification of the Consent Decree</u>.  This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated except by a written instrument signed by the Parties.  In the event that there is a dispute regarding a change, waiver, discharge, or termination of any provision(s), either Party may seek resolution from the Court.

84. <u>Assignment</u>. The rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Settling Parties, and their successors and assigns.  Defendant shall notify Plaintiff within ten (10) business days of any assignment.

85. <u>Force Majeure</u>.  Either Parties' performance of any requirement of this Consent Decree shall be extended or modified in the case of a force majeure event as follows:

a.      A "force majeure event" is any event arising from causes beyond either Party's control that prevents or delays the performance of any requirement of this Consent Decree despite its reasonable efforts to fulfill the requirement including, but not limited to, acts of war, terrorism, domestic insurrection and riots, Acts of God, extreme weather (including earthquakes or windstorms with winds exceeding 70 mph), large scale fires, offsite or third party calamities which adversely affect the Facility (e.g., explosion at adjacent business).

b.      The requirement to exercise "reasonable efforts to fulfill the requirement" includes using good faith efforts to anticipate force majeure events and good faith efforts to address the effects of any such event:  (a) as it is occurring; and (b) after it has occurred, to prevent or minimize any delay to the extent reasonable, subject to paramount concern for human health and safety.

c.      A force majeure event includes government orders or restrictions related to COVID-19 and comparable public health threats.  Any Party seeking to rely upon this paragraph to excuse or postpone performance shall have the burden of establishing that it could not reasonably have been expected to avoid the force majeure event, and which by exercise of reasonable diligence has been unable to overcome the failure to perform.

d.      A force majeure event does not include normal inclement weather, a financial inability to perform, or employee negligence, but does include willful or deliberate employee or third party criminal violence or sabotage.

e.      If Diversified seeks to avoid performance of any requirement of this Consent Decree on account of a force majeure event, it shall provide written notice to Plaintiff no later than ten (10) business days after the time that Diversified first knew of, or by the exercise of due diligence, should have known of, a force majeure event.  The notice shall state the anticipated duration of any delay, its cause(s), and propose an alternative schedule for performing the affected requirement(s).

f.      If Plaintiff agrees that a force majeure event has occurred, Plaintiff shall agree to extend the time for Diversified to perform the affected requirement(s) for the time necessary to complete those obligations.

g.      If Plaintiff does not agree that a force majeure event has occurred or does not agree to the extension of time sought by Diversified, it may invoke the Dispute Resolution Procedures in Section IV of this Consent Decree.

86. Correspondence.  All notices required herein or any other correspondence pertaining to this Consent Decree shall be, to the extent feasible, sent via electronic mail transmission to the e-mail address listed below, or if electronic mail is not feasible, then by certified U.S. mail with return receipt, overnight delivery, or by hand delivery to the following addresses:

If to Plaintiff:

Jesse C. Swanhuyser
Sycamore Law, Inc.
414 Olive Street
Santa Barbara, CA 93101
jesse@sycamore.law
(805) 689-1469

With copies to:

Frederic Evenson, Board Chair
Ecological Rights Foundation
867 B Redwood Drive
Garberville, California 95542
evenson@ecologylaw.com
(831) 454-8216

If to Defendant:

Judith M. Praitis
Faegre Drinker Biddle & Reath, LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
judith.praitis@faegredrinker.com
(310) 203-4022

With copies to:

Richard Bell, CEO
2345 Statham Boulevard
Oxnard, CA 93033
Rich@dpspanels.com
805-988-5070 (office)
805-732-5490 (cell)

Notifications of communications shall be deemed received on the earlier of three (3) calendar days after the date that they are postmarked and sent by first-class mail, or upon proof of delivery for overnight delivery, upon receipt when personally delivered, or upon delivery after acknowledgement of receipt by the receiving party.  Any change of address or addresses shall be communicated in the manner described above for giving notices.

The Settling Parties hereto have entered into this Consent Decree and submitted it to the Court for its approval and entry of final judgment.

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date set forth below.

**APPROVED AS TO CONTENT**

ECOLOGICAL RIGHTS FOUNDATION

by: _____
        Frederic Evenson
        Director

DIVERSIFIED PANELS SYSTEMS, INC.

by: _____
        Richard Bell
        President/CEO

Date:  _____, 2021                     Date:  _____, 2021


**APPROVED AS TO FORM**

SYCAMORE LAW, INC.                          FAEGRE DRINKER BIDDLE & REATH, LLP

by:  _____             by:  _____
     Jesse Swanhuyser                            Judith Praitis
     Attorney for Plaintiff                         Attorney for Defendant

Date:  _____, 2021                     Date:  _____, 2021


     The stay is lifted.  The above-captioned action is DISMISSED with prejudice and this Consent Decree and Judgment shall be entered.  Defendant's motion to dismiss [Doc. # 13] is DENIED as moot.  All court dates and deadlines are VACATED.


**IT IS SO ORDERED.**

DATED:  September 27, 2021        _____
                                                         DOLLY M. GEE
                                                         UNITED STATES DISTRICT JUDGE

1    upon proof of delivery for overnight delivery, upon receipt when personally delivered,

2    or upon delivery after acknowledgement of receipt by the receiving party.  Any

3    change of address or addresses shall be communicated in the manner described above

4    for giving notices.

5        The Settling Parties hereto enter into this Consent Decree and submit it to the

6    Court for its approval and entry of final judgment.

7

8    IN WITNESS WHEREOF, the undersigned have executed this [proposed] Consent
     Decree as of the date set forth below.

9

10   **APPROVED AS TO CONTENT**

11

12   ECOLOGICAL RIGHTS FOUNDATION        DIVERSIFIED PANELS SYSTEMS, INC.

13   by: _____          by: _____

14       Frederic Evenson                     Richard Bell

15       Director                             President/CEO

16   Date: _July 26____, 2021              Date: _____, 2021

17

18

19   **APPROVED AS TO FORM**

20

21   SYCAMORE LAW, INC.                    FAEGRE DRINKER BIDDLE & REATH, LLP

22   by: _____          by: _____

23       Jesse Swanhuyser                     Judith Praitis

24       Attorney for Plaintiff               Attorney for Defendant

25   Date: _07/26____, 2021               Date: _____, 2021

26

27

28

[proposed] Consent Decree and Order          23          Case No. 2:21-cv-03552-
DMG
ACTIVE.133323395.14

1    upon proof of delivery for overnight delivery, upon receipt when personally delivered,

2    or upon delivery after acknowledgement of receipt by the receiving party.  Any

3    change of address or addresses shall be communicated in the manner described above

4    for giving notices.

5        The Settling Parties hereto enter into this Consent Decree and submit it to the

6    Court for its approval and entry of final judgment.

7

8    IN WITNESS WHEREOF, the undersigned have executed this [proposed] Consent
     Decree as of the date set forth below.

9

10   **APPROVED AS TO CONTENT**

11

12   ECOLOGICAL RIGHTS FOUNDATION            DIVERSIFIED PANELS SYSTEMS, INC.

13   by: _____         by: _____

14        Frederic Evenson                        Richard Bell
15        Director                                President/CEO

16   Date: _____, 2021                  Date: __7/26/__, 2021

17

18

19   **APPROVED AS TO FORM**

20

21   SYCAMORE LAW, INC.                       FAEGRE DRINKER BIDDLE & REATH, LLP

22   by: _____         by: _____

23        Jesse Swanhuyser                        Judith Praitis
24        Attorney for Plaintiff                  Attorney for Defendant

25   Date: _____, 2021                  Date: __July 26__, 2021

26

27

28

[proposed] Consent Decree and Order              23                      Case No. 2:21-cv-03552-
DMG
ACTIVE.133323395.14

**EXHIBIT A**

**STORMWATER POLLUTION PREVENTION PLAN**

# STORM WATER POLLUTION PREVENTION PLAN
## Diversified Panels Systems

# TABLE OF CONTENTS

General Facility Information

1.0      Overview

2.0      Storm Water Pollution Prevention Team

3.0      Potential Sources of Pollutants

4.0      Other Plans Incorporated by Reference

5.0      Best Management Practices (BMPs)

6.0      Monitoring Implementation Plan (MIP)

7.0      Record Keeping and Reporting

8.0      Certification of the SWPPP

Tables

  1      Summary of Significant Materials
  2      Summary of BMPs

Figures

  1      DPS Facility Location Map
  2      DPS Vicinity Flood Control Waterways
  3      DPS Vicinity Map
  4      DPS Facility Layout
  5      DPS Drainage


Attachments

  A      Forms and Checklists for Annual Report
         A1 – Daily Inspection Forms
         A2 – Annual Compliance Report Forms
         A3 – Monthly Non-Stormwater Discharge Visual Observation Forms
         A4 – Stormwater Sampling Visual Observation Forms
         A5 – Stormwater Sampling and Analysis Forms
  B      Employee Training Attendance Roster
  C      Stormwater Sampling Guidance
  D      Parameter NAL Values, Test Methods, and Reporting Units

# STORM WATER POLLUTION PREVENTION PLAN

## GENERAL FACILITY INFORMATION

Name of Facility:  **Diversified Panels Systems**

Facility Address:  **2345 Statham Boulevard, Oxnard, CA 93033**

Facility Contact

      Name:  **Pat McGuire**

      Title:  **Vice President**

      Phone:  **(805) 988-5070 Ext. 3 (office)  or  (818) 205-7845 (cell)**

      Mailing
      Address:  **2345 Statham Boulevard, Oxnard, CA 93033**

Business Owner:  **Richard Bell**

Facility Operator:  **Diversified Panels Systems**
(if different from owner)

Standard Industrial
Classification Code: **3585**
(SIC)

Emergency Contact (preferably on-site):

      Name:  **Pat McGuire**

      Phone:  **(805) 988-5070 Ext. 3 (office)  or  (818) 205-7845 (cell)**

3

# Storm Water Pollution Prevention Plan

# Diversified Panels Systems

## 1.0    OVERVIEW

### 1.1    Introduction

This Storm Water Pollution Prevention Plan (SWPPP) covers the operations at Diversified Panels Systems, herein after referred to as "DPS." It has been developed as required by the State Water Resources Control Board for storm water discharges and in accordance with best management practices. This SWPPP describes this facility and its operations, identifies potential sources of storm water pollution at the facility, recommends appropriate **b**est **m**anagement **p**ractices ("BMPs") or pollution control measures to reduce the discharge of pollutants in storm water runoff, includes a Monitoring Plan which also specifies reporting requirements, and provides for at least annual review of this SWPPP.

The Industrial General Permit regulates industrial storm water discharges and authorized non-storm water discharges from industrial facilities in California. The Industrial General Permit is called a general permit because many industrial facilities are covered by the same permit but comply with its requirements at their individual industrial facilities. The State Water Resources Control Board (State Water Board) and Regional Water Quality Control Boards (collectively, the Water Boards) implement and enforce the Industrial General Permit. The Statewide General Permit for Storm Water Discharges Associated with Industrial Activities, Order 2014-0057-DWQ (Industrial General Permit) implements the federally required storm water regulations in California for storm water associated with industrial activities discharging to waters of the United States. This SWPPP also is intended to satisfy any successor to the current Industrial General Permit, although an update may be needed if there are new terms applicable to the facility in a successor Industrial General Permit.

### 1.2    SWPPP Objectives

The primary goal of the SWPPP is to maintain or improve the quality of receiving waters by ensuring that operations at the DPS facility do not result in any unauthorized discharges to the storm drain system.

This SWPPP will:

1. Identify sources of storm water discharges and authorized non-storm water discharges to the storm water drainage system.

2. Identify and prescribe appropriate "source area control" type best management practices designed to prevent storm water contamination from occurring.

3. Prescribe actions that are needed to ensure that only authorized non-storm water discharges enter the storm drainage system.

4. Prescribe an implementation schedule to ensure that the storm water management actions described in this plan are carried out and evaluated on a regular basis.

## 1.3    Facility Description

DPS operates at an industrial facility located at 2345 Statham Boulevard in Oxnard, California ("Facility"). The location of the Facility is shown on Figure 1 and Figure 2. DPS assembles the modular components used by customers to construct a large free standing cold storage unit such as a cooler or freezer typically used for large scale food or beverage storage.

The primary components assembled at the facility are interlocking pre-painted metal panels used to construct the walls, floor, and ceiling of a cold storage building. The metal panel systems are engineered and built to customer specifications and needs with the goal of little or no cutting or waste generation at the construction site. The interlocking metal panel systems allow for the cold storage buildings to be easily expanded or reconfigured as needed by the customer. All DPS metal panels include a closed cell, Energy Star qualified, expanded polystyrene (EPS) product core to meet insulation values associated with energy regulations for both coolers and freezers.

## 1.4    Facility Layout

DPS operations are conducted on approximately half of the industrial property located at 2345 Statham Boulevard in Oxnard, California. DPS does not own the property and only operates on the eastern portion of the property as shown on Figure 3.

The layout of the facility operated by DPS is shown on Figure 4 and generally includes (1) the eastern portion of the parking area and a drive-through right-of-way on the north end of the property where no industrial activities by DPS occur, (2) indoor operations within the easternmost portion of the building, (3) a front parking area located east of the building used primarily by DPS for customer and employee parking, (4) the eastern portion of the parking and a drive-through right-of-way on the south end of the property used for unloading material received and load-out of finished product, (5) an outdoor storage area primarily used for finished product and trash storage, and (6) some small, landscaped areas.

Areas of industrial activity conducted by DPS and subject to the Industrial General Permit are further described under Section 1.5 (Facility Operations) below and include (1) a material unloading and finished product loading area; (2) indoor cutting, assembly, and wrapping; and (3) an outdoor storage area used primarily for finished product and trash storage.

Although DPS only operates on a portion of the industrial property located at 2345 Statham Boulevard in Oxnard, California, for reference, the entire property includes (1) parking and a drive-through right-of-way along the north edge of the property, (2) a large building, (3) a front parking area located east of the building used primarily by DPS for customer and employee parking, (4) parking and a drive-through right-of-way along the west edge of the property which is shared with the off-site adjacent property (currently occupied by Dixieline Lumber) located to the west at the address of 2325 Statham Parkway, (5) parking and a drive-through right-of-way along the south edge of the property, and (6) outdoor areas south of the property building used primarily for finished product storage by DPS and fleet parking and maintenance by Iron Mountain. DPS operations only occupy the easternmost (approximately half) portion of the 2345 Statham Boulevard property as shown in Figure 3. The western portion of the 2345 Statham Boulevard property is occupied by an independent operation (Iron Mountain) with no affiliation to DPS.

## 1.5     Facility Operations

DPS operations generally involve (1) material unloading, (2) indoor cutting and assembly of metal panels and packaging of finished product, (3) outdoor storage including finished product, trash, and recyclable metal, and (4) finished product load-out as detailed below and within the locations shown on Figure 4. A list of significant materials associated with operations conducted at the facility is provided as Table 1.

### *Material Unloading*

Unloading of materials received at the Facility is conducted within an asphalt paved area that measures approximately 0.1 acres and is located outside the two easternmost roll-up doors on the south side of the building within the drive-through right-of-way just south of the facility building as shown in Figure 4.

Materials are received via large transport flat-bed truck trailer with unloading conducted using forklifts. Materials removed from trucks are moved indoors for staging prior to use and are not exposed to storm water. Materials received at the Facility include:

1) Generally, five loads of expanded polystyrene ("EPS") product are received each day of operation. The EPS product arrives as a slab that measures approximately 16-feet by 4-feet by 3.33-feet and approximately 16 slabs make up a load.

2) Generally, two loads of metal material are received twice per week. Metal material arrives in a roll that measures approximately 4-feet in diameter and is approximately 4-feet wide. Each load includes approximately 6 rolls.

3) Totes of adhesive are received in 275-gallon caged plastic totes (measure approximately 3.5 x 3.5 x 3.5 feet). Each delivery includes approximately 10 totes and generally is received once per month.

4) The resin components of a two-part polyurethane which is injected into doors to form an insulation material is purchased in a 3,624 pounds compressed tank

6

which has a calculated liquid volume of 341 gallons. A compressed tank of this material generally is received once every 3 months.

5) The isocyanate components of a two-part polyurethane which is injected into doors to form an insulation material is purchased in a 3,400 pounds compressed tank which has a calculated liquid volume of 370 gallons. A compressed tank of this material generally is received once every 3 months.

6) Plastic stretch wrap is received on palatized rolls with approximately 2 pallets received per month.

### *Indoor Product Cutting, Assembly and Finished Product Packaging*

All DPS pre-assembly, cutting, and assembly operations are conducted indoors and are completely sheltered from weather events. Additionally, all liquid and non-liquid materials related to cutting and assembly operations are stored indoors and are not exposed to weather events.

Operations include cutting EPS product slabs using hot-wire machines, metal material cutting and bending, gluing cut EPS product so that it becomes the inner core to the finished metal panel, and injection of foam into the door components assembled by DPS. Finished metal panels are bundled and wrapped indoors then either directly loaded onto trucks for transport off-site or, on occasion for large scale projects, temporarily moved to the Outdoor Storage Area, to be staged for a few days prior to load-out. If product is too large to be wrapped while still indoors, then the product is wrapped partially indoors and final wrapping occurs outdoors in the Outside Storage Area on the same day the product is moved to the Outdoor Storage Area. Hydraulic oil is used and stored on-site for the maintenance of the cutting machines.

Auxiliary indoor operations include forklift storage and consolidation of all EPS product scraps in a melting/vitrification machine which consolidates the scraps into chunks of inert solids. DPS operates four propane-fueled forklifts used for material unloading and finished product loading. Forklifts are parked indoors when not in use. Propane tanks are stored indoors in a secured cage and maintenance on the forklifts is conducted by an outside vendor within the building. The solid waste generated from EPS product melting is placed into the trash roll-off bin located within the Outdoor Storage Area.

Access to the outdoors from the DPS cutting and assembly areas is limited to four roll-up doors (shown on Figure 3 and Figure 5) which are only open during business hours when personnel are present during the operating hours of 6:30 am to 4:30 pm. On Fridays the facility often operates with reduced hours.

7

### *Outdoor Storage Area*

On occasion, when a large customer order, or series of orders close in time, require the assembly of more finished product than can be directly loaded from inside the facility building onto trucks for transport off-site, finished metal panels are bundled then plastic wrapped to be relocated to the asphalt paved Outdoor Storage Area shown in Figure 3 and Figure 4.

The Outdoor Storage Area used by DPS is located south of the drive-through right-of-way on the south end of the property and measures approximately 0.7 acres. The Outdoor Storage Area used by DPS is separated by a chain-link fence from the off-site up-gradient fleet parking and fleet maintenance area used by Iron Mountain. The Outdoor Storage Area used by DPS is fully fenced and accessible only though a driveway on the north side of the area. A 4-inch concrete curb is located along the south and east Outdoor Storage Area boundaries. Concrete curbs are also present on the northern boundary of the Outdoor Storage Area except where a driveway into the storage area is located. Strips of landscaping are present between the concrete curb and the DPS Facility boundary as shown in Figure 4.

The bottom of each wrapped finished metal panel bundle includes panels spaced to keep the bundle off the ground and allow for lifting by the forklift. The only other items located in the Outdoor Storage Area are roll-off bins used for solid waste and for scrap steel. All bins either are tarped at the end of each day and only un-tarped during operating hours or the bins have self-closing lids. The bins are replaced weekly as needed when filled. In the future, the Outdoor Storage Area used by DPS could be used to stage materials used at the facility for maintenance, construction, or operations. Discarded or waste materials will be placed in roll-off bins.

### *Finished Product Load-out*

The loading of trucks with wrapped finished metal panel bundles is conducted within the same 0.1-acre asphalt paved area described above as the unloading area and shown in Figure 4. Wrapped finished metal panel bundles are either directly loaded onto trucks from the building or from the Outdoor Storage Area. Generally, five truckloads of bundled finished metal panels are loaded and shipped out daily.

### 1.6    Facility Drainage

The DPS facility boundary and drainage is shown in Figure 5. The entire DPS facility covers 3.5 acres and includes approximately 0.2 acres of landscaped area with little to no contribution to drainage/runoff and approximately 3.3 acres of impermeable surface that drains from the facility. The entire area within the DPS facility is generally flat with a small change in grade directing any flow within the area towards the east to Statham Boulevard via sheet flow and concrete drainage swales. With the exception of the facility building and landscaped areas, all other portions of the DPS facility receive run-on from off-site upgradient non-DPS operations located west of DPS. All landscaped areas are

situated within a 4-inch curb with soil below the height of the curb and little to no potential soil erosion or runoff.

Sheet flow exiting the DPS facility, which includes run-on from off-site upgradient non-DPS operations located west of DPS, flows to Statham Boulevard then to the south along the street curb until it reaches a stormwater inlet drain on the curb face on Statham Boulevard just north of Channel Island Boulevard approximately 850-feet south of DPS. The storm drain carries water subsurface and likely to the west to the channelized Ormond Lagoon Waterway (aka Oxnard Industrial Drain). As shown in Figure 2, the channelized Ormond Lagoon Waterway extends approximately 2 miles to the east then transitions to an unchanneled section for 1 mile before terminating at the Ormond Beach Lagoon.

Sheet flow exiting the DPS facility is limited to two driveways at Statham Boulevard and two discharge locations from grates at the eastern end of the concrete swales in the Outdoor Storage Area. Because no industrial operations are conducted north of the building, the discharge from the north driveway is not impacted by any DPS industrial activities. Discharge from DPS industrial activities is limited to the southern driveway and the two grates in the Outdoor Storage Area.

As shown in Figures 3 and 5, run-on to the DPS facility results from sheet flow and flow within concrete drainage channels from off-site upgradient non-DPS operations located west of DPS including Dixieline Lumber and Iron Mountain. Dixieline Lumber operates from a building and a large commercial lumber yard addressed at 2325 Statham Parkway Unit C. Iron Mountain conducts shredding within the building addressed at 2345 Statham Boulevard (the same address used by DPS) and maintains a fleet of approximately 50 trucks in the lot adjacent and to the west of the Outdoor Storage Area used by DPS.

Run-on, drainage, and run-off within specific areas on the DPS facility are discussed in more detail below.

### *North DPS Drive-Through Right-of-Way and Parking Area*

An asphalt paved drive-through right-of-way and parking area that measures approximately 0.56 acres is located north of the property building as shown in Figures 3 through 5.

The north drive-through right-of-way and parking area is generally flat with a small change in grade directing any flow within the area to the east. A concrete drainage swale is located through the middle of the area and runs from the west to the east. The drainage swale is designed to carry run-on from off-site upgradient non-DPS operations located west of DPS plus drainage from the north drive-through right-of-way and parking area towards the east where flow discharges at the street driveway on Statham Boulevard.

9

DPS conducts no industrial activities north of the building within the drive-through right-of-way and parking lot. Sheet flow exiting the DPS facility at the north driveway on Statham Boulevard is not a DPS industrial activity discharge location.

### *Material Unloading and Finished Product Load-out Area Drainage*

Unloading of materials received at the Facility and load-out of finished product is conducted within an asphalt paved area that measures approximately 0.1 acres and is located outside the two easternmost roll-up doors on the southern side of the building within the drive-through right-of-way as shown in Figure 4.

The unloading/load-out area is generally flat with a small change in grade directing any flow within the area to the south and east. A concrete drainage swale is located south of the unloading area and is designed to carry run-on from off-site upgradient non-DPS operations located west of DPS plus drainage from the DPS unloading/load-out area towards the east where any sheet flow and flow within the concrete drainage swale discharges from the facility at the street driveway on Statham Boulevard.

### *Indoor Product Cutting, Assembly and Finished Product Packaging Area Drainage*

All DPS cutting and assembly operations are conducted indoors and are completely sheltered from weather events. Access to the outdoors from the DPS operational areas is limited to 4 roll-up doors which are only open during business hours when personnel are present during the routine operating hours of 6:30 am to 4:30 pm.

DPS conducts no wet operations; therefore, no drainage from inside the building occurs. DPS conducts no particulate or vapor generating operations; therefore, there are no contaminants exhausting to the building roof. Drainage from the building roof is not affected by any industrial activities conducted by DPS and discharges to drainage swales located north and south of the operations building.

### *Outdoor Storage Area Drainage*

The Outdoor Storage Area used by DPS is generally flat with a small change in grade directing any flow within the storage area slightly east as well as towards one of the two concrete drainage swales that traverse the storage area from west to east as shown in Figures 3 through 5.

The two concrete drainage swales are designed to carry run-on from off-site upgradient non-DPS operations located west of DPS (currently used as a fleet parking and fleet maintenance area by Iron Mountain), plus drainage from the Outdoor Storage Area towards the east. Near the east end of the Outdoor Storage Area, each drainage swale terminates at a drain grate. The drain grates have been designed to receive flow into a small concrete chamber approximately 2-foot by 2-foot (and likely 2-feet deep) then route the flow from the concrete drainage swales through a subsurface 3-inch pipe to the curb face on Statham Boulevard.

10

## 2.0    STORM WATER POLLUTION PREVENTION TEAM

The storm water pollution prevention team is responsible for developing, implementing, maintaining, and revising this SWPPP. The members of the team are familiar with the management and operations of DPS.

The member (s) of the team and their responsibilities *(i.e., implementing, maintaining, record keeping, submitting reports, conducting inspections, employee training, conducting the annual compliance evaluation, testing for non-storm water discharges, signing the required certifications) are as follows:*

Name: **Pat McGuire**

Title:   **Vice President**

Phone: **(805) 988-5070 Ext. 3 (office)  or  (818) 205-7845 (cell)**

Responsibility: **Implementation & maintaining of plan, recordkeeping, employee training, conducting inspections, and annual compliance evaluations. Serves as Site Safety Manager.**


Name:       **Richard Bell**

Title:       **President**

Phone:       **(805) 988-5070 (Office); (805) 732-5490 (cell)**

Responsibility: **To conduct/appoint site safety manager's responsibilities if he/she is unable to do so and serve as emergency contact. Serves as the Legally Responsible Person.**

## 3.0    POTENTIAL SOURCES OF POLLUTANTS

### 3.1    Site Maps

Figures 3 through 5 present a DPS Facility vicinity map and several DPS Facility layout maps that show the following features:

❑  Figure 3 is a DPS facility vicinity map that shows the DPS facility boundary, the larger 2345 Statham Boulevard property boundary, adjacent business entities located west and upgradient of DPS, and concrete drainage swales that traverse the upgradient properties and the DPS facility.

❑  Figure 4 shows the DPS facility layout including the portion of the building used by DPS, the outdoor DPS unloading and load-out area, the Outdoor Storage Area used by DPS, and landscaped areas within the DPS facility boundary. DPS areas of industrial activity are limited to the DPS portion of

11

the building, the outdoor DPS unloading and load-out area, and the Outdoor Storage Area used by DPS. All DPS cutting and assembly operations are conducted indoors and are completely sheltered from weather events. The unloading and load-out area and the Outdoor Storage Area are the only two locations where materials used in assembly or produced by DPS are directly exposed to precipitation. The landscaped areas within the DPS facility boundary are the only areas that are pervious. All other areas are impervious.

❑ Figure 5 shows all storm water drainage areas within the DPS facility boundary, portions of drainage area impacted by run-on from off-site upgradient non-DPS operations located west of DPS, the flow direction of each drainage area, landscaped area, drainage swales, the non-industrial activity affected discharge location at the north driveway at Statham Boulevard, and the industrial activity-affected discharge locations at the south driveway at Statham Boulevard ("Discharge Sample Location #1"), the northern grate in the Outdoor Storage Area ("Discharge Sample Location #2), and the southern grate in the Outdoor Storage Area ("Discharge Sample Location #3).

## 3.2     Inventory of Potential Sources of Pollution & Significant Materials

The industrial materials handled at the DPS facility, the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency are described in Section 1.5 (Facility Operations) and summarized in the attached Table 1.

## 3.3     Description of Potential Pollutant Sources

As described in Section 1.5 (Facility Operations) and summarized on Table 1, significant materials stored and handled at the DPS Facility are limited to the following:

1) Slabs of EPS product

2) Metal material

3) Adhesive

4) Resin (a components of a two-part polyurethane)

5) Isocyanate (a components of a two-part polyurethane)

6) Plastic stretch wrap

7) Hydraulic oil

8) Scraps of EPS product

9) Melted and solidified EPS product

10) Scrap Metal

12

11) Finished Metal Panels

12) Trash and Debris

## *Material Unloading and Finished Product Load-out*

Materials are received and unloaded in the unloading/load-out area south of the building using forklifts. Additionally, finished metal panel bundles wrapped in stretch plastic are load-out out within the same area.

Materials received are moved indoors for staging prior to use and are not exposed to storm water. In the unlikely event of a liquid spill during unloading operations, the spill would be contained using materials in a spill kit staged immediately inside the building roll-up door. Additionally, truck drivers are informed every time they arrive to be loaded or unloaded that they are to inspect their truck and cleanup any incidental spill or leaks.

In the unlikely event of a release of trash or any other particulate matter during unloading or load-out operations, DPS personnel are trained to collect the trash and prevent trash from leaving the DPS facility. Trash is placed in a bag or other closed receptacle and the containerized trash is placed into the trash roll-off bin located within the Outdoor Storage Area.

## *Indoor Cutting, Assembly and Finished Product Packaging*

All DPS assembly and cutting operations are conducted indoors and are completely sheltered from weather events. Additionally, all liquid and non-liquid materials related to assembly operations are stored indoors and are not exposed to weather events. In the unlikely event of a liquid (flowable) spill indoors, the spill would be contained within the Facility building using absorbent pads and absorbent socks kept inside the facility spill kit. An additional precaution to contain a spill inside the facility building is the storage of containers and placement of machines that use liquids no closer than 50-feet from the roll-up doors.

EPS product cutting scraps and any other EPS product trash incidentally generated during assembly and cutting operations is collected and placed in an EPS product melting machine where it is vitrified into a solid mass. All other trash generated indoors is placed in a bag or other closed receptacle and the containerized trash is placed into the trash roll-off bin located within the Outdoor Storage Area.

## *Outdoor Storage Area*

Finished metal panels are bundled and wrapped in stretch plastic prior to staging in the outdoor asphalt paved Outdoor Storage Area. The only other items located in the Outdoor Storage Area are two roll-off bins used for solid waste that are tarped at the end of each day and during a rain event and one roll-off bin used for scrap metal that is also tarped at the end of each day and during a rain event.

No liquid is handled or stored in the Outdoor Storage Area. In the unlikely event of a release of trash or any other particulate matter with the storage area, DPS personnel are trained to collect the trash and prevent trash from leaving the DPS facility. Trash is placed in a bag or other closed receptacle and the containerized trash is placed into the trash roll-off bin located within the Outdoor Storage Area.

### *Trash and Scrap Metal Storage*

Trash and debris generated at the facility are placed into roll-off bins located in the Outdoor Storage Area. The roll-off bins are tarped at the end of each day and during a rain event or have self-closing lids. Recyclable scrap metal is stored in separate roll-off bins in the Outdoor Storage Area and is also tarped at the end of each day and during a rain event or the bins have self-closing lids.

### *Non-Storm Water Discharges*

The only **authorized** (allowable) non-storm water discharges ("NSWDs") present at the facility is landscape irrigation.

No unauthorized NSWDs were noted during site inspection nor are expected based on the layout and operations conducted at DPS. Unauthorized non-storm water discharges are prohibited under the Industrial General Permit. Any unauthorized non-storm storm water discharges which may occur must be eliminated or covered under another NPDES permit.

### *Parking Areas*

Parking areas in the north, east, and south are not areas of industrial activity of significant sources of pollution; however, BMPs have been included for these areas.

### *Significant Spills and Leaks*

There are no known significant spills or leaks at the facility.

## 4.0    OTHER PLANS INCORPORATED BY REFERENCE

The following plans are incorporated into the SWPPP by reference:

- ◆ **Emergency Response Plan (includes Spill Response Plan)**
- ◆ **Hazardous Materials Business Plan**

The Site Safety Manager maintains these plans in the office.

## 5.0    BEST MANAGEMENT PRACTICES (BMPs)

Based on the potential and existing sources of storm water contamination identified in Section 3.2 and Section 3.3 above, DPS has implemented Best Management Practices that are intended to eliminate pollutants and to prevent storm water from becoming contaminated. BMPs are summarized in Table 2 and described in detail below.

## 5.1    Minimum and Advanced Best Management Practices

DPS relies on both minimum (primarily nonstructural) and advanced (primarily structural) BMPs that have been designed to prevent pollutants associated with onsite activities from having contact with storm water runoff or authorized non-storm water discharges. Minimum BMPs are common practices at industrial facilities, such as good housekeeping and preventative maintenance. Advanced BMPs consist of treatment control BMPs, exposure reduction BMPs, and storm water containment and discharge reduction BMPs. The Advanced BMPs in place at DPS are limited to exposure reduction and fabric filters on discharge drains in the Outdoor Storage Yard.

The following sections present baseline and source-specific minimum and advanced BMP.

**Baseline BMPs:**

❑ **Good Housekeeping:**  The following good housekeeping BMPs are implemented to prevent pollutants from entering storm water discharges:

1. Keep facility free of litter and debris. Trash cans are placed within the building and bins in the Outdoor Storage Area to eliminate any accumulation of litter on the property.

2. Operational equipment (forklift) is maintained in good working condition. This equipment is inspected frequently for leaks and repaired as needed. If repair of this equipment is to be done onsite, it is completed indoors.

3. Paved surfaces that drain to storm drains are kept clean by dry manual and mechanical sweeping; water is not used to hose down these surfaces. Cleaning is to be done based on the results of daily inspections. Cleanup materials such as brooms, shovels, dustpans, and mechanical vacuums and sweepers are maintained around the facility for this purpose. Brooms and hand sweeping are sufficient for smaller areas while vacuuming and/or mechanized sweeping is employed for larger areas.

4. Good housekeeping tips and reminders are posted on employee bulletin boards.

15

❑ **Preventative Maintenance:** Preventive maintenance involves the daily inspection and maintenance of all areas within the Facility boundary. Preventive maintenance BMPs include:

1. DPS will inspect all outdoor areas of the Facility, particularly around the perimeter, at least once each business day to determine whether EPS product fragments are found in outdoor areas of the facility. DPS will complete a daily log to note when the inspection was conducted. Blank log forms are included as Attachment A1 to this SWPPP.

2. DPS will promptly remove EPS fragments observed by either manual collection or sweeping for minor amounts, and by vacuuming or mechanized sweeping for larger amounts. Manual collection and sweeping for minor amounts, and vacuuming or mechanized sweeping for larger amounts, are technology based BMPs that have been identified as reflecting best industry practice based on technological availability, economic practicability, achievability, and effectiveness to address EPS product fragments as a component of an integrated inspection and response suite of measures to mitigate discharge of pollutants due to industrial activities at the facility.

3. In addition, at or near the end of each operating business day, DPS will conduct a final inspection of all outdoor areas of the Facility, particularly around the perimeter, to determine whether EPS material fragments are found in outdoor areas of the Facility. DPS will promptly remove EPS fragments observed by manual sweeping, vacuuming, and/or by mechanized sweeping for larger amounts.

4. DPS will log its observation of the condition of the Facility after the final inspection and, if applicable, after removal of EPS fragments, as of the end of the operating business day to document the absence of discharges of EPS fragments. DPS will also note on the daily log the collection conducted and in what location(s). Blank log forms are included in Attachment A1 to this SWPPP.

5. Roll-off bins for trash and scrap metal are tarped at the end of each day and during a rain event or have self-closing lids.

6. As part of the outdoor area inspection described above, the trash bin area is inspected daily and cleaned as necessary during operational days to verify this area is not a pollutant source. Inspections and cleanings are to be noted on a daily log form. Blank log forms are included in Attachment A1 to this SWPPP.

7. All facility assembly and cutting operations occur indoors.

❑ **Spill Response:** DPS has a written Spill Contingency Plan that is maintained by the Vice-President, Pat McGuire. Spill response BMPs include:

16

1. Maintaining employee training on the elements of the SWPPP. Training for employees is conducted initially at hire and annually thereafter.

2. Keep rags, damp mops, and absorbents readily accessible. Dispose of waste properly. ***Spill kits are maintained near hazardous material and hazardous waste storage areas.***

3. Do not hose down "dirty" pavement or impervious surfaces where fluids have spilled. Use dry cleanup methods.

4. Train employees to daily check for leaks and spills.

5. Require truck drivers to check their own vehicles for leaks and spills.

❑ **Materials Handling & Storage:** Though loading/unloading is conducted in the public right-of-way road, storage of products and materials used in facility operations only occurs indoors, except for temporary storage of finished products in the Outdoor Storage Yard, and waste or recyclable materials in bins in the Outdoor Storage Yard.

When unloading EPS product arriving for use at the facility, DPS will use extreme care to avoid fragmenting the product. DPS will promptly pick up manually or with a vacuum or mechanical sweeper any EPS fragments generated during unloading. When unloading and transport operations are complete, DPS will inspect the surrounding area and pick up remaining EPS fragments. DPS will move EPS product and metal materials (e.g., galvanized metal, steel) inside the building from the unloading area and will not hold outdoors for more than 24 hours any EPS product or metal materials arriving for use at the Facility.

Finished product will be staged in the Outdoor Storage Area to the south of the right-of-way when not direct loaded onto a truck for customer delivery.

❑ **Employee Training and Awareness:** Training records are included as Attachment B. Training BMPs include:

1. Employees should be informed of activities (primarily material unloading and finished product handling) that could potentially cause contamination of storm water and the importance of carefully conducting these activities.

2. Refresher training (particularly during the rainy season) will be conducted annually, on or by October 1 of each year.

3. Employee training, at minimum, will include:

   a. SWPPP requirements.

   b. Spill response and reporting.

      c.  Good Housekeeping.

      d.  BMP updates and implementation

      e.  Materials and waste handling and storage procedures.

❑ **Waste Handling:** Trash and debris generated at the facility is placed into roll-off bins located in the Outdoor Storage Area. Recyclable scrap metal is stored in separate roll-off bin in the southern portion of the site. Waste handling and recycling BMPs include:

1. Roll-off bins are to be tarped at the end of each day and during a rain event or shall be self-closing bins.

2. Roll-off bins are not to be rinsed or otherwise cleaned using water.

3. Employees will be trained to inspect roll-off bins for leaks and wipe up leakage if identified.

4. The roll-off bin area will be mechanically swept or otherwise cleaned to collect all loose solids for proper disposal into the roll-off bins as necessary based on the daily inspection. Water is not to be used to hose down this area for cleaning purposes.

5. If the amount of waste accumulated appears to frequently exceed the capacity of the roll-off bins currently managed, then either another roll-off bin will be added or the pickup schedule will be increased.

6. DPS will provide one or more durable, sealed containers or bags in which to store EPS product fragments accumulated during indoor cutting and assembly or during indoor manual and mechanized collection/cleaning. The collected and bagged EPS product fragments will either be transferred to the melting machine (if clean of general waste/trash) or, placed in closed containers in the building; if not melted these fragments can eventually be disposed of in the trash roll-off bin.

7. For EPS product fragments accumulated in outdoor manual or mechanized collections, DPS will contain such materials in a sealed bag or other closed receptacle and deposit such fragments on the day of collection into the trash roll-off bin.

❑ **Record Keeping:** The blank forms located in Attachment B are included for the record keeping associated with the SWPPP.

❑ **Erosion Control & Site Stabilization:** Landscaped areas are not to be over watered.  Maintain unpaved areas landscaped to avoid erosion.

❑ **Inspections:** Facility inspections will be conducted monthly in accordance with the required frequency specified in the Industrial General Permit to determine if the storm water pollution prevention controls are being effectively and properly implemented. Specific BMPs that are not working as designed or properly implemented will be noted and brought to the attention

18

of the appropriate SWPPP team member. If deficiencies are found during the inspection, the inspector and/or SWPPP team member will determine whether operation and/or maintenance activities require modifications in order to comply with the SWPPP or if the BMPs need to be revised. These operational and maintenance changes will be prioritized and implemented and the SWPPP revised.

1.  The inspection will verify that the site drainage conditions and potential pollution sources identified in the SWPPP remain accurate, and that the BMPs prescribed in the SWPPP are being implemented, properly operated, and adequately maintained.

2.  An inspection report (included in Attachment B) shall include the inspection date, inspection personnel, scope of the inspection, relevant

3.  observations, incidents of noncompliance and corrective actions taken, revisions needed in the SWPPP, and an implementation schedule.

**Source-specific BMPs:**

❑ **Paved parking areas for employee vehicles:**

1.  Trash and other debris will be removed by manual collection, vaccuming or mechanically sweeping from all parking areas as needed based on the results of the daily visual inspections. Hosing off of paved surface areas is not permitted.

2.  Automotive or maintenance activities are not permitted in the vehicle parking areas. Place drip pans under any leaking vehicle. If forklifts need maintenance, this is to be conducted indoors.

❑ **Loading and Unloading Area:**

1.  Trash and other debris will be removed by manual or mechanically sweeping from the area as needed based on observations during loading and unloading activities and based on the results of the daily visual inspections.

2.  Automotive or maintenance activities are not permitted in the loading/unloading areas. Place drip pans under any leaking vehicle. If forklifts need maintenance, this is to be conducted indoors.

- ❑ **Roll-off Bins: scrap metal & general waste storage:**

    1. Employees instructed to tarp the roll-off bins at the end of each day and prior to a rain event or otherwise ensure self-closing lids are in place.

    2. Areas around roll-off bins are to be inspected daily to prevent the accumulation of dirt and debris around them.

    3. A roll-off bin disposal service interval has been optimized to ensure that roll-offs are not overfilled to the point where tarps either do not cover the entire top of the bin or cannot be secured or closed. Weekly reviews will be conducted to ensure that the disposal service interval is commensurate with the amount of trash or recyclable material being generated in order to prevent overfilling conditions.

- ❑ **Outdoor Storage Area:**

    1. A fabric filter engineered to capture particulate matter down to 1 millimeter will be installed under each of the storm grates within the Outdoor Storage Area. The filter will be inspected monthly and replaced if damaged or clogged by either oil/grease or sediment. Trash captured by the filter will be removed for disposal monthly. The filter will be adjusted for stormwater sample collection and immediately returned to service.

    2. DPS will entirely wrap all finished products, including ends, before they leave the building. The area around the finished product staging area to be inspected daily to prevent the accumulation of debris around them.

    3. Employees have been instructed to clean up small spills immediately and notify their supervisor.

- ❑ **Landscaped Areas:**

    1. Do not overwater, keep unpaved areas landscaped to prevent erosion.

    2. Employees have been instructed to notify their supervisor if overwatering is occurring or if the irrigation system needs repair.

- ❑ **Equipment service & repair operations:**

    1. All service and repair operations for forklifts or on-site cutting and assembly equipment conducted indoors.

    2. Defective/leaking equipment is reported to the Vice-President, Pat McGuire, for follow-up repair or replacement.

## 5.2    Evaluation of Best Management Practices

An evaluation of BMPs will be conducted on an annual basis in association with facility inspections in order to determine the success, revision, or failure of specific BMPs. This evaluation must be documented on the annual form titled "Annual BMP Evaluation Form" and provided in Attachment A2. If the SWPPP needs to be revised because the evaluation of the BMPs indicates that additional BMPs are needed or modifications to the existing BMPs are needed, the revision(s) will be implemented within 90 days of the evaluation. The annual evaluation of BMPs will include:

- A review of all visual observations and inspection records. Visual observations are performed monthly for non-stormwater discharges and daily inspections will also be performed. Daily inspection logs are included in Attachment A1 of this plan. Monthly visual observation forms are included in Attachment A3 of this plan. The daily observations are recorded on the form titled "Daily Inspection Log" and the monthly non-stormwater discharge inspections are recorded on the form titled "Monthly Visual Observations of Non-Storm Water Discharges (NSWDs)". These records must be retained for five years and will also be used for the annual evaluation that must be done on the SMARTS website.

- A visual inspection of all potential pollutant sources to determine if pollutants have entered the storm drain. This inspection will be documented in monthly observations forms titled "Monthly Visual Observations of Non-Storm Water Discharges (NSWDs)" and also in the annual evaluation form titled "Annual BMP Evaluation Form". Both forms are included in Attachment A of this plan.

- A review of BMPs to ensure that they are properly implemented and maintained. Each BMP described in this plan must be evaluated annually. The evaluation will be noted in the annual form included in Attachment A2 and titled" Annual BMP Evaluation Form".

The annual evaluation report to be prepared by Mr. Pat McGuire of DPS will document any necessary revisions or termination of an active BMP and will be noted in the annual inspection and evaluation forms provided in Attachment A2 of this plan.

## 6.0    MONITORING IMPLEMENTATION PLAN (MIP)

### 6.1    Implementation Schedule

The monitoring program will be implemented starting July 1 of each year.

### 6.2    Objectives

The objectives of the monitoring program are to:

a. Ensure that storm water discharges are in compliance with the applicable Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this Industrial General Permit.

b. Ensure practices at the facility to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges are evaluated and revised to meet changing conditions.

c. Aid in the implementation and revision of the SWPPP required by Section A of the Industrial General Permit.

d. Measure the effectiveness of best management practices (BMPs) to prevent or reduce pollutants in storm water discharges and authorized non-storm water discharges.

## 6.3     Monthly Visual Observations

Visual observations will be conducted once per calendar month. The visual observations will be conducted during daylight hours, on days with no storm water discharges, and during scheduled facility operating hours. Visual observations will include authorized non-storm water discharges (limited to landscape irrigation) and unauthorized non-storm water discharges. Observations will include:

a. The presence or indications or prior, current, or potential unauthorized non-stormwater discharges and their sources,

b. Authorized non-stormwater discharges (landscape irrigation) to ensure compliance, and

c. The Outdoor Storage Area, the loading/unloading area, BMPs, and all other potential sources of industrial pollutants.

These observations must be logged in the monthly observation forms included in Attachment A3 of this plan. The visual observations of authorized non-storm water discharges (irrigation only) and non-authorized non-stormwater discharges (all other discharges that are neither irrigation or rainwater) will be recorded on the form titled "MONTHLY VISUAL OBSERVATIONS OF NON-STORM WATER DISCHARGES (NSWDs)". If any NSWDs are identified in the monthly inspections then they must be fully described on the forms in Attachment A3 and included in the annual report. The paper copies will be retained by DPS for five years and used to complete the annual report submittal on the online SMARTS website.

## 6.4     Sampling Event Visual Observations

Sampling event visual observations shall be conducted at the same time sampling occurs at the Discharge Sample Locations as shown in Figure 5. DPS will observe the discharge of storm water and note observations as described thoroughly below at the following locations:

(1) the southern driveway at Statham Boulevard ("Discharge Sample Location #1"),

(2) the northern grate in the Outdoor Storage Area ("Discharge Sample Location #2), and

(3) the southern grate in the Outdoor Storage Area ("Discharge Sample Location #3).

These observations must be logged on the forms titled "Sampling Event Visual Observation Log – Page 1" and "Sampling Event Visual Observation Log – Page 2" included in Attachment A4 of this plan. The paper copies will be retained by DPS for five years and used to complete the annual report submittal on the online SMARTS website. On the form titled "Sampling Event Visual Observation Log – Page 1", record information for each sampling event conducted throughout the year.

On the form titled "Sampling Event Visual Observation Log – Page 2", record information on the following required observations:

a. DPS will ensure that visual observations of storm water discharged from the facility are conducted at the time that the discharge is sampled and documented soon after if not simultaneously.
b. DPS will visually observe and record the presence or absence of floating and suspended materials.
c. DPS will visually observe and record the presence or absence of oil and grease or a sheen on the water.
d. DPS will visually observe and record the presence or absence of discolorations such as milky, dark, or other colors in the water.
e. DPS will visually observe and record the presence or absence of turbidity by noting how muddy the flow is or if the flow is carrying a heavy amount of soil.
f. DPS will visually observe and record the presence or absence of odors.
g. DPS will visually observe and record the presence or absence of trash/debris.

At the completion of sampling, if any of the above listed issues are found to be present, DPS will walk upgradient of the sample location in an attempt to identify the source or sources of any noted issue or issues. The SWPPP will be revised, as necessary, and implemented in accordance with Section X Part B of the Industrial General Permit, when it is determined that BMPs are not sufficient or require modification.

If visual observations are not conducted during a sampling event, DPS will provide an explanation in the Annual Report for uncompleted sampling event visual observations.

## 6.5    Sampling and Analysis

DPS will collect storm water samples from two of the three Discharge Sample Locations shown on Figure 5 within four hours from first discharge of a qualifying storm event (QSE) (or at the start of facility operations if the QSE occurs within the previous 12-hour period) four times during the water year: two (2) times from July 1 to December 31 and

two (2) times from January 1 to June 30.

As defined in the Industrial General Permit, a Qualified Storm Event is one that produces a discharge from at least one drainage area at the site and is preceded by 48 hours with no discharge from any drainage area.

DPS is eligible to reduce the number of QSEs sampled each reporting year if the results from four (4) consecutive QSEs that were sampled did not exceed any Numeric Action Levels (NALs) [discussed below] and that DPS is in full compliance with the requirements of the Industrial General Permit included updating, certifying, and submitting all required documents, data, and reports via SMARTS. The reduced sample frequency requires collecting and analyzing samples from one (1) QSE in the first half of the reporting year and one (1) QSE from the second half of the reporting year.

For each sample event, the date and time and results from each sample location must be noted on the sampling event form provided in Attachment A5 of this plan. A paper copy of this form will be retained by DPS with a paper copy of the analytical results for five years. The forms will be used to assist with the electronic submittal on the online SMARTS website.

A Stormwater Sampling Guidance document is included as Attachment C.

The samples collected will be tested in the field for pH using wide range litmus paper in the field. Additionally, the sample collected will be submitted to an off-site laboratory to be analyzed for:

a.  Total suspended solids (TSS) by EPA Method 160.2 (SM 2540D).
b.  Oil and grease (O&G) by EPA Method 1664.

While under the Industrial General Permit, toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities require analysis, for DPS none have been identified or will be included at present based on facility conditions. No other analytical parameters as listed in Table 1 of the Industrial General Permit are required based on the pollutant source assessment conducted for the DPS facility and summarized in Section 3.0 of this plan.

The Industrial General Permit incorporates a multiple objective performance measurement system that includes Numeric Action Levels (NALs) and Exceedance Response Actions (ERAs) that may be triggered if the NALs are exceeded. The NALs are included as Attachment D to this plan. Exceedances of the NALs will change DPS's status from "Baseline" to Level 1 for the next reporting year. DPS will obtain the services of a Qualified Industrial Stormwater Practitioner (QISP) if such an exceedance occurs in order to perform an ERA.

Sample collection and visual observations are not required under the following conditions:

a. During dangerous weather conditions such as flooding or electrical storms; or,

b. Outside of scheduled facility operating hours. However, DPS is not precluded from collecting samples or conducting visual observations outside of scheduled facility operating hours.

In the event that samples are not collected, or visual observations are not conducted in accordance with Section XI.B.5 of the Industrial General Permit due to these exceptions, an explanation shall be included in the Annual Report.

## 6.6 Annual Comprehensive Site Compliance Evaluation

The DPS Vice President, Pat McGuire, will conduct one comprehensive site compliance evaluation per year between the reporting periods of July 1 to June 30. The SWPPP will be revised, as appropriate, and the revisions implemented within 90 days of the evaluation. (See "No Exposure Certification" (NEC) form and checklist in Attachment B to determine if the facility qualifies for the NEC and to assist with annual updates to the SWPPP.)

The annual report will be completed using the forms provided in Attachment A2 of this plan. Paper copies of each form will be retained by DPS and used to complete the electronic submission of the annual report. The annual report to be submitted will be made available annually online and will be submitted through the SMARTS system. Evaluations will include:

1) A review of the monthly non-stormwater discharge visual observations (Attachment A3) and sampling visual observation records (Attachment A4), all daily inspection records (Attachment A1), and sampling and analysis results (Attachment A5). Forms have been prepared for each of these records as well as the sampling and analysis results and are included in Attachment A of this plan.

2) An annual visual inspection of all areas of industrial activity and potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system. This visual inspection must be documented on the Annual Report form included as Attachment A2.

3) An annual inspection of the industrial drainage area. The results of this inspection must be documented on the Annual Report form included as Attachment A2.

4) A review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed.  A visual inspection of equipment needed to implement the SWPPP, such as (i) tarps used on roll-off bins, (ii) spill response equipment, and (iii) equipment used for cleaning/vacuuming will be included. The results of this review will be documented on the form titled "ANNUAL BMP EVALUATION FORM" included in Attachment A2.

25

5) An evaluation report that includes, (i) identification of personnel performing the evaluation, (ii) the date(s) of the evaluation, (iii) necessary SWPPP revisions, if any (iv) any incidents of non-compliance and the corrective actions taken, and (v) a certification that the facility operator is in compliance with the Industrial General Permit. If the certification cannot be provided, an explanation will be included in the evaluation report as to why the facility operator is not in compliance with the Industrial General Permit. The evaluation report will be submitted as part of the annual report, retained for at least five years, and signed and certified in accordance with Part B of Section X of the Industrial General Permit. The evaluation report form is included in Section H of the "Annual Report" included in Attachment A2 of this plan.

## 6.7    Annual Report

DPS will certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS and based on the completion of the paper forms included in Attachment B of this plan. DPS will retain paper copies of this annual report for five years.

DPS will include the following in the Annual Report:

1. A Compliance Checklist that indicates whether DPS complies with, and has addressed, all applicable requirements of this Industrial General Permit. This checklist is provided as Section G of the "Annual Report" paper form included in Attachment A2 of this plan.

2. An explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist. An "Annual Report Explanations Attachment Sheet" is included in the paper form of the "Annual Report" included in Attachment A2 of this plan.

3. An identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year. A form for the SWPPP revisions is titled "SWPPP Revisions Identification Form" and included with the "Annual Report" in Attachment A2 of this plan.

4. The date(s) of the Annual Evaluation.

## 7.0    RECORD KEEPING AND REPORTING

Paper records of all storm water monitoring information and copies of all reports (including the Annual Reports) required by the Industrial General Permit will be retained for a period of at least five years. All requisite forms are included in Attachment A of this plan. These records include:

a. The date, place, and time of site inspections, sampling, visual observations, and/or measurements.

b. The individual(s) who performed the site inspections, sampling, visual observations, and or measurements.

c. The date and approximate time of analyses.

d. The individual(s) who performed the pH testing in the field.

e. The laboratory that performed the laboratory analyses.

f. Analytical results, method detection limits, and the analytical techniques or methods used.

g. Quality assurance/quality control records and results

The following recordkeeping and reporting documents will be maintained with this plan for a period of not less than five years:

❑ Employee training records (Attachment B of this plan)

❑ Annual Report (Attachment A2)

❑ Laboratory Reports for Analysis (R

❑ Inspection Logs (

❑ Visual Observation Forms (Attachments A3 and A4)

<u>Electronic Signature and Certification Requirements</u>

All Permit Registration Documents (PRDs) for NOI and NEC coverage shall be certified and submitted via SMARTS by the Discharger's Legally Responsible Person (LRP). For DPS, the LRP is Mr. Rich Bell. All other documents may be certified and submitted via SMARTS by the LRP or by his designated Duly Authorized Representative. Mr. Pat McGuire may act as Mr. Bell's Duly Authorized Representative.

When a new LRP or Duly Authorized Representative is designated, DPS will ensure that the appropriate revisions are made via SMARTS. In unexpected or emergency situations, DPS understands that it may be necessary for DPS to directly contact the State Water Board's Storm Water Section to register for SMARTS account access in order to designate a new LRP.

DPS understands that documents certified and submitted via SMARTS by an unauthorized or ineligible LRP or Duly Authorized Representative are invalid.

## 8.0    CERTIFICATION OF THE SWPPP

*"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

(Signature of Authorized Representative)      7/26/21
                                              (Date)

Richard Bell                         **President**
(Pinted Name)                        (Title)    CEO

28

**EXHIBIT B**


**FACILITY MAP**



**Statham Parkway**

**Statham Boulevard**    Statham Pkwy

**Dixieline Lumber**

**Iron Mountain Shredding**

**Diversified Panels Systems (DPS)**

**Dixieline Lumber Storage Area**

R1

B

A

C

D1

**Iron Mountain Storage**    R2    **DPS Outdoor Storage**    D    D2

R3    E    D3

Statham Blvd.

NORTH

0'   50'   100'
Approximate Scale

**Legend**

| | |
|---|---|
| ▨ | Dixieline Lumber Roof Area (9,000 sf) |
| ▨ | Dixieline Lumber Frontage and Parking (37,500 sf) |
| ▨ | Dixieline Lumber Storage Area (20,600 sf) |
| ▨ | Iron Mountain Roof (19,500 sf) |
| ▨ | Iron Mountain Frontage and Access Road (24,500 sf) |
| ▨ | Iron Mountain Parking and Vehicle Maintenance Area (34,500 sf) |
| ▨ | Diversified Roof (25,000 sf) |
| ▨ | Diversified Frontage and Access Road (37,000 sf) |
| ▨ | Diversified Outdoor Storage Area (35,500 sf) |

Imagery Date: 8/19/2019

**Exhibit B**
**DPS and Vicinity Drainage and Discharge Point**

**Diversified Panels Systems**
2345 Statham Blvd.
Oxnard, California

**Legend**

⬜ Approximate DPS Facility Boundary

⬜ Approximate 2345 Statham Boulevard Property Boundary

— Concrete Drainage Swale

⬛ Rollup Door to DPS Portion of the Building

🔵 Approximate DPS Industrial Discharge Points

🟠 Approximate Run-on Points

🔴→ Photograph Location and Direction

🔲 Right-of-Way from Roll-up Door
🔲 Run-on Point towards Statham Blvd.

C Discharge Point #1 towards Statham Blvd.
D Discharge Point #2 towards Statham Blvd.

E Discharge Point #3 towards Statham Blvd.

Waterstone Environmental, Inc.
2936 East Coronado Street
Anaheim, California 92806

| | |
|---|---|
| Drafted By: BAA | Version: 1.0 |
| Approved By: EG | Date: 7-7-2021 |

**EXHIBIT C**

**SAMPLE CALCULATIONS**

**Exhibit C**

**Run-On Calculations and Formula for Diversified Discharge Points**

Discharge Point 1 Surface Area Calculations

| Area Description | Discharges To | | Surface Area, sf | Percent SA |
|---|---|---|---|---|
| Dixie Lumber Roof | Run-On Point 1 | | 9,000 | 5% |
| Dixie Lumber Frontage and Parking | Run-On Point 1 | | 37,500 | 22% |
| Dixie Lumber - Storage Area | Run-On Point 1 | | 20,600 | 12% |
| Iron Mountain Frontage and Access Road | Run-On Point 1 | | 24,500 | 14% |
| Iron Mountain Roof | Run-On Point 1 | | 19,500 | 11% |
| Diversified Roof | Discharge Point | | 25,000 | 14% |
| Diversified Frontage and Access Road | Discharge Point | | 37,000 | 21% |
| **Totals for** | **Run-On Point 1** | | 111,100 | 64% |
| | **Diversified Discharges** | | 62,000 | 36% |
| | | **Overall Total** | **173,100** | **100%** |

Discharge Point 2 Surface Area Calculations

| Area Description | Discharges To | | Surface Area, sf | Percent SA |
|---|---|---|---|---|
| Iron Mountain Parking and Vehicle | Run-On Point 2 | | 34,500 | 49% |
| Diversified Product Storage Area | Discharge Point | | 35,500 | 51% |
| | | **Overall Total** | **70,000** | **100%** |

**General Equation:**

Diversified Contaminant Discharge Concentration = ((\[Contaminant Discharge Point\] * Total Surface Area) - (\[Contaminant Run-On Point\] * Offsite Surface Area)) / (Diversified Surface Area)

**Example 1 - Discharge Point 1 (Concentrations for Run-on and Discharge Points Are the Same)**

| Run-On/Discharge Point | Contaminant Concentration | | Area | Surface Area (SA), sf | Percent Contribution |
|---|---|---|---|---|---|
| Run-on Point 1 Concentration | 300 mg/L | | Surface Area for Run-on | 111,100 sf | 64% |
| Discharge Point 1 Concentration | 300 mg/L | | Diversified Surface Area | 62,000 sf | 36% |
| | | | | 173,100 | 100% |

| Category | Conc., mg/l | | Surface Area, sf | | Mass Surrogate | | |
|---|---|---|---|---|---|---|---|
| Total Mass Surrogate | 300 | x | 173,100 | = | 51,930,000 | | |
| **Minus the following:** | | | | | | | |
| Total Run-on Contribution | 300 | x | 111,100 | = | 33,330,000 | | |
| | | | | | Remaining Mass | Diversified SA, sf | Diversified's Calculated Discharge Concentration |
| **Diversified Contribution** | | | | | **18,600,000** / | **62,000** = | **300 mg/kg** |

**Example 2 - Discharge Point 1 (Concentration at Run-on Point Is Higher than Discharge Point)**

| Run-On/Discharge Point | Contaminant Concentration | | Area | Surface Area (SA), sf | Percent Contribution |
|---|---|---|---|---|---|
| Run-on Point 1 Concentration | 450 mg/L | | Surface Area for Run-on | 111,100 sf | 64% |
| Discharge Point 1 Concentration | 300 mg/L | | Diversified Surface Area | 62,000 sf | 36% |
| | | | | 173,100 | 100% |

| Category | Conc., mg/l | | Surface Area, sf | | Mass Surrogate | | | |
|---|---|---|---|---|---|---|---|---|
| Total Mass Surrogate | 300 | x | 173,100 | = | 51,930,000 | | | |
| Minus the following: | | | | | | | | |
| Total Run-on Contribution | 450 | x | 111,100 | = | 49,995,000 | | | |
| | | | | | Remaining Mass | | Diversified SA, sf | Diversified's Calculated Discharge Concentration |
| Diversified Contribution | | | | | 1,935,000 | / | 62,000 | = | 31 mg/kg |

**Example 3 - Discharge Point 2 (Concentration at Discharge Point Is Higher than Run-on Point)**

| Run-On/Discharge Point | Contaminant Concentration | | Area | Surface Area (SA), sf | Percent Contribution |
|---|---|---|---|---|---|
| Run-on Point 2 Concentration | 250 mg/L | | Surface Area for Run-on Point 2 | 34,500 sf | 49% |
| Discharge Point 2 Concentration | 500 mg/L | | Diversified Product Storage Area | 35,500 sf | 51% |
| | | | | 70,000 | 100% |

| Category | Conc., mg/l | | Surface Area, sf | | Mass Surrogate |
|---|---|---|---|---|---|
| Total Mass Surrogate | 500 | x | 70,000 | = | 35,000,000 |
| Minus the following: | | | | | |
| Run-on Point 1 Contribution | 250 | x | 34,500 | = | 8,625,000 |

| | Remaining Mass | | Diversified SA, sf | | Diversified's Calculated Discharge Concentration |
|---|---|---|---|---|---|
| Diversified Contribution | 26,375,000 | / | 35,500 | = | 743 mg/kg |

**Example 4 - Discharge Point 2 (Concentration at Discharge Point Is Lower than Run-on Point)**

| Run-On/Discharge Point | Contaminant Concentration | | Area | Surface Area (SA), sf | Percent Contribution |
|---|---|---|---|---|---|
| Run-on Point 2 Concentration | 500 mg/L | | Surface Area for Run-on Point 2 | 34,500 sf | 49% |
| Discharge Point 2 Concentration | 250 mg/L | | Diversified Product Storage Area | 35,500 sf | 51% |
| | | | | 70,000 | 100% |

| Category | Conc., mg/l | | Surface Area, sf | | Mass Surrogate | | | |
|---|---|---|---|---|---|---|---|---|
| Total Mass Surrogate | 250 | x | 70,000 | = | 17,500,000 | | | |
| **Minus the following:** | | | | | | | | |
| Run-on Point 1 Contribution | 500 | x | 34,500 | = | 17,250,000 | | | |
| | | | | | **Remaining Mass** | | **Diversified SA, sf** | **Diversified's Calculated Discharge Concentration** |
| **Diversified Contribution** | | | | | **250,000** | / | **35,500** = | **7 mg/kg** |